[Crim. No. 735.   Fourth Dist.   May 19, 1950.]

THE PEOPLE, Respondent, v. JOHN S. DARNELL et al., Appellants.

Earl C. Broady for Appellants.

Fred N. Howser, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

MUSSELL, J.—Defendants, with one Karl Johnson, were charged with the crime of conspiracy to commit grand theft on May 7, 1949, and in a second count of the information with the crime of theft of $357, the personal property of Winston W. Gay. A jury trial resulted in the acquittal of Johnson as to both counts, the conviction of the other defendants of conspiracy as charged in the first count of the information and in an acquittal as to the charge of grand theft. Defendants appeal from the verdicts and judgments on the grounds that the evidence was insufficient to justify the judgments and that the trial court committed prejudicial and reversible error in the admission of evidence.

The facts, briefly, are as follows: Winston W. Gay, 74 years old, a caretaker for the Bethel Baptist Church, on May 7, 1949, went to a bank in San Diego where he cashed two checks for $34 each and also withdrew $100 to apply on a pledge to his church. Upon leaving the bank, he walked to the corner of Fifth and E Streets, where defendant Darnell stopped him and said "Pardon me," and in broken English informed Gay that he (Darnell) was a Jamaican and had just arrived in San Diego on a British vessel; that he had met a woman to whom he had given a $50 bill to buy some liquor and that the woman had absconded with his money. Darnell, who was dressed in a zippered coverall suit, exhibited a roll of money, on the outside of which was a $100 bill. Gay stated that it was dangerous to disclose such a roll and Darnell replied that his real money was in his pants. At this time, defendant Moless walked up. Darnell touched him on the shoulder and related the same story that he had told Gay. Darnell again exhibited his money and Moless and Gay warned him to be more careful. At the suggestion of Moless, the three men moved to a grocery store nearby. At this place Darnell remarked that where he came from, colored people couldn't go

into public places, especially banks. Both Moless and Gay asserted that colored men could go into banks and Gay declared that he had just come from one himself. Darnell insisted that such couldn't be done. At about this time Fulton joined the group. Thereafter the discussion continued about colored men going into banks and Fulton asked if Darnell would wager $500 that such couldn't be done. Darnell accepted the wager and placed $500 in a handkerchief. The four men walked back to the bank to show Darnell that he had been misled into the belief that colored men couldn't go into banks and keep money in them. Upon arriving at the bank, Moless and Gay went to a window where Gay presented his passbook and withdrew $180 from his account to make a partial payment on a street assessment. At the same time Moless obtained a package of pennies at the next bank window. Gay and Moless then joined Darnell and Fulton and the group walked south on Sixth Street, where they stopped near a store.

Moless then produced an envelope and suggested that the men cooperate to try to take care of Darnell, who was too careless with all his money. Moless then suggested that the money be put in the envelope, that it be addressed to Gay at his residence and that it be registered and mailed. Gay addressed the envelope as agreed and wrote his name on it with an indelible pencil, giving his address at 707 South 30th Street.

Gay had suggested that Darnell leave his money with the captain of his boat or at his hotel but Darnell said he would not leave it in those places but would leave it with Gay and would come for it when he was ready to leave town. Gay agreed to keep his money for him.

Gay placed approximately $357 of his own money in the envelope and when Darnell was ready to place his money in it, Moless told him not to open his clothing on a public street but to step around the corner and remove his money. Darnell did step around the corner and when he returned, Gay could see something visible in the envelope. The group then started walking toward Fifth and E Streets, with Darnell holding the envelope in his hand. They turned toward the post office and a block away from it Moless declared that he had an urgent call to make. The rest of the group then walked toward a telephone on the corner, at which there was a mailbox. Darnell walked up to the box, pulled down the drop and released the envelope, over the protests of Gay. Darnell then "started to cry and rave" and said that he was going to get an axe to open up the box and get his money out. Darnell then proceeded

rapidly north, accompanied by Fulton. Meanwhile, Moless turned to Gay and asked for his continued cooperation to save Darnell and his money. Moless declared that he would go ahead and would take care of the other two but that he would return in an hour and that they would meet at the same place. Moless then walked away and Gay contacted a traffic officer, to whom he told his story.

Gay did not receive his money or any part thereof through the mail.

Witnesses were called who saw a Buick car in the vicinity with more than one colored man in it, but were unable to identify the defendants. The same Buick car was stopped by officers of the United States Border Patrol service at about 2 o'clock of the same afternoon near Dana Point. Darnell, Moless, Johnson and Fulton were removed from the car and about $450 in cash was taken from them, which sum included one $100 bill and a roll of pennies.

The defendants were taken to jail and there questioned by police officers. Darnell at first maintained that he, Fulton and Moless had engaged in a crap game by a building adjacent to a parking lot in San Diego, where he had parked his automobile on May 7th, and that Fulton had won all the money. Moless and Fulton also told a story that Fulton had won money shooting dice in a parking lot in a game which had included Darnell, Moless, Fulton and Gay. Moless admitted having gone to the bank with Gay to obtain a roll of pennies for use in the dice game. In a second conversation with the officers, Darnell stated that there had been no crap game; that the scheme had been discussed for a few minutes in the parking lot in San Diego; that Moless had procured an envelope which he had given to Darnell; that Darnell had placed his own money in the envelope; that Gay had placed his money in the envelope and that the envelope had been given back to Moless who had slipped it to Fulton. Out of town, Fulton had opened the envelope and had given Darnell $38 out of it as his cut.

Evidence of another offense of a similar nature involving the defendant Darnell was admitted. This offense was alleged to have taken place about October, 1949, and the testimony indicated that defendant Johnson had contacted the complaining witness, Mr. Needholm, after the latter had come out of a bank in Los Angeles, at which time Johnson had stated that he was a Jamaican who had just come to Los Angeles; that

he was looking for a woman. Darnell had then come up and joined in the conversation, ostensibly as a stranger to Johnson. As in the instant case, the same approach about the rights of colored men in banks had been used to induce Needholm to make a withdrawal and Darnell had accompanied Needholm to the bank, just as Moless had accompanied Gay in the case at bar.

Evidence was also introduced showing that one Amos C. Millings, on November 23, 1949, in Oakland, had been contacted by Moless, who used the identical approach outlined in the Gay transaction, namely, the story of a Jamaican, speaking broken English, who had just come off the boat and was looking for a woman. A colored man had joined Moless and Millings and a conversation followed wherein the Jamaican insisted that a Negro was unable to have a bank account, and, whereas in the Gay transaction an envelope was used, in the Millings case a paper sack was utilized, but the nature of the transactions substantially was the same.

The final similar offense involved a student named Samuel Lawrence Cotton and took place on or about October 19, 1949, in Los Angeles. In this case a gun was used and Fulton told the same story as related to Gay by Darnell in San Diego on May 7, 1949, namely, that he had just gotten off a boat; that he had money and had given $50 for liquor to a woman who had vanished through the side door of a bar. After Darnell had joined them, a discussion followed about the rights of a colored man to do banking.

The evidence seems to us to be sufficient to establish the offense of conspiracy to commit the crime of grand theft. The objection that the evidence of the commission of similar offenses was inadmissible is without merit. ▮ Evidence of other acts of a similar nature may be admitted, when not too remote, to prove a material fact or where they tend to show motive, scheme, plan or system. (*People* v. *Henderson,* 79 Cal.App.2d 94, 119 [179 P.2d 406] ; *People* v. *Poo On,* 49 Cal.App. 219, 223 [192 P. 1090] ; *People* v. *Bernstein,* 88 Cal.App.2d 522, 525 [199 P.2d 22].) Such similar acts may be either before or after the perpetration of the crime charged. (*People* v. *Weir,* 30 Cal.App. 766, 767 [159 P. 442] ; *People* v. *Talbot,* 220 Cal. 3, 17, 18 [28 P.2d 1057].) In the instant case, the evidence of acts of a similar nature shows a continuous practice of the same nature after the acts on which the convictions resulted and had a definite bearing on the

intent of the defendants, as well as showing that they had a definite plan or system.

The defendants contend that since they were found not guilty of the crime of grand theft, they could not be convicted of a criminal conspiracy to commit that offense. This contention is untenable. (*People* v. *Klinkenberg,* 90 Cal. App.2d 608, 635 [204 P.2d 47, 613].) As was said in *People* v. *Gordon,* 71 Cal.App.2d 606, 628 [163 P.2d 110]:

''Conspiracy is a distinct offense of which the parties may be guilty even though they have been convicted of the substantive crime. (*People* v. *Martin,* 114 Cal.App. 392, 396 [300 P. 130].) The purpose of evidence in a conspiracy case is to establish an illicit concord of the participants. (*People* v. *Stevens,* 78 Cal.App. 395, 408 [248 P. 696]), and the conspiracy is established when it is shown that the defendants entertained a mutual design to commit the offense designated as the aim of the conspirators, followed by an overt act in pursuance of such design. The secret agreement of defendants having been proved by White and the numerous overt acts in furtherance of their conspiracy having been attested by the victims of their unlawful scheme, the verdict has substantial support. (*People* v. *George,* 74 Cal.App. 440, 452 [241 P. 97].)''

In the instant case the evidence is sufficient to show that the defendants conspired to commit a crime and engaged in overt acts leading to its commission and the fact that they failed to accomplish the object of their intrigue is no defense. (*People* v. *George,* 74 Cal.App. 440, 454, et seq. [241 P. 97]; *People* v. *Klinkenberg, supra,* 635.)

The overt acts charged in the information before us are not specific crimes charged in the second count of the information. They are, in brief, that the defendants, pursuant to the objects and purposes of the conspiracy, carried on a conversation with the complaining witness at Fifth and E Streets in San Diego on May 7, 1949, and did on the same date engage in a second conversation with the complaining witness at Sixth and Broadway in said city; that to carry out the objects and purposes of the said conspiracy, they were on the same date in a Buick automobile near San Clemente, county of Orange and in the same automobile in a parking lot at 845 Seventh Avenue in San Diego.

The finding that these overt acts were committed is not inconsistent with the finding that the defendants were not

guilty of grand theft. This distinction is pointed out in *In re Johnston,* 3 Cal.2d 32, at page 35 [43 P.2d 541]. In *People v. Clement,* 97 Cal.App. 238, 241 [275 P. 511], the appellant was acquitted of the direct charge of robbery and was found guilty of conspiracy to commit robbery. The court there said that the robbery need not have been fully accomplished by the appellant in order to warrant his conviction of conspiracy. As was said in *People* v. *George,* 74 Cal.App. 440, 453 [241 P. 97]:

"If, then, an indictment correctly charges an unlawful combination and agreement as actually made, and, in addition, describes *any act* by any one of the parties to the unlawful agreement, as an act intended to be relied on to show the agreement in operation, it is sufficient, although upon the face of the indictment, it does not appear in what manner the act described would tend to effect the object of the conspiracy."

In the instant case the defendants were tried on two separate counts; each count being considered as a separate and distinct offense. The doctrine of res adjudicata applies as to any matters in issue which the verdict determines. (*People v. Beltran,* 94 Cal.App.2d 197, 205 [210 P.2d 238].)

■ Defendants claim error in the admission of evidence of questions asked defendant Darnell and his answers thereto at the preliminary examination. These questions were asked for the purpose of impeachment. Defendant Fulton's attention was likewise directed to his testimony taken at the preliminary examination for purposes of impeachment. We conclude that the evidence was admissible.

■ One of the officers who had questioned defendant Fulton testified, as a part of the conversation he had with Fulton, that Fulton stated he had been in trouble in Oakland but that it was "mistaken identity." This statement was one of many made in the conversation related by the officer. Although the prosecution was permitted to ask defendant Fulton the following questions: "How many times have you testified in court under oath?", and "How many times have you been a witness?" Fulton answered that he had been a witness in a courtroom but once in his life but that had not occurred recently. Such questions, although improper, do not constitute prejudicial error.

Since the evidence clearly supports the conviction in the instant case, a reversal is not justified when it clearly appears that the jury in all probability would have rendered a verdict

of guilty even in the absence of any dereliction on the part of the district attorney in asking the questions complained of. Under section 4½ of article VI of the Constitution of the State of California reviewing courts are not permitted, where matters prejudicial in their character appear in the record, to reverse such judgments unless from the entire record it appears that there has been a miscarriage of justice. *People* v. *Green,* 96 Cal.App.2d 283, 292 [215 P.2d 127].)

Judgments affirmed.

Griffin, Acting P. J., and Shepard, J. pro tem., concurred.