Lloyd J. COSGROVE and Paul V. Doyle, Appellants,

v.

UNITED STATES of America, Appellee.

No. 13626.

United States Court of Appeals Ninth Circuit.

June 18, 1954.

On Rehearing June 22, 1955.

Joseph L. Alioto, James E. Burns, William C. Danielson, San Francisco, Cal., for appellants.

Warren Olney, III, Asst. Atty. Gen., Rex A. Collings, Jr., Sp. Asst. to Atty. Gen., Washington, D. C., Lloyd H. Burke, U. S. Atty., John Lockley, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before HEALY, ORR and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

The application of the principle of *res judicata* is the chief question in this case.

1. *The Indictment*

The indictment was returned on April 15, 1952. Count 1 recited that the appellant Doyle was a Deputy Collector of Internal Revenue in San Francisco, California, and that the appellant Cosgrove, also of San Francisco, was the attorney for persons required by law to file United States estate tax returns in connection with the estates of Luigi Ferrari, Paul Fontana, and Mario Ferrando. Count 1 contained the following other allegations:

Ferrari, Fontana, and Ferrando died on August 2, 1946, December 1, 1946, and April 20, 1947, respectively, and left taxable estates in connection with which returns were required by law to be filed on or before December 2, 1947, March 1, 1948, and July 20, 1948, respectively.

Beginning on November 15, 1947, and continuously thereafter until the filing of the indictment, the appellants conspired with each other and with other

148

persons to the grand jury unknown, to defraud the United States and to commit offenses against it, towit:

(a) To defraud the United States of penalties with respect to certain returns to be filed in connection with the above three estates, in the following manner: The three returns would not be filed on or before the dates on which they were due, and when they were filed Doyle would stamp the Ferrari return as having been received by the Collector on December 2, 1947; the Fontana return as having been received on February 27, 1948; and the Ferrando return as having been received on July 20, 1948—the last two with their respective remittances.

(b) To violate 18 U.S.C.A. § 1001, by "knowingly and willfully" falsifying, concealing and covering up by a trick, scheme and device, a material fact, towit, the respective dates on which the respective returns would be filed, and by making false, fictitious and fraudulent statements and representations as to the dates on which the returns would be filed and on which the returns would be duly executed, "in documents, towit, United States Estate Tax Returns as hereinbefore set forth, * * * the said defendants * * * knowing said documents to falsify, conceal and cover up by a trick, scheme and device, material facts and to contain false, fictitious and fraudulent statements, * *."

This conspiracy count sets forth nine overt acts, including an allegation that the appellant Doyle "did stamp and caused to be stamped", on April 22, 1949, a stamp indicating that Ferrari's return was received by the Collector on December 2, 1947. Similar averments are made with respect to the Fontana return, which it is alleged was stamped on September 21, 1948, as having been received with remittance on February 27, 1948; and with respect to the Ferrando return, stamped on April 4, 1949, as having been received with remittance on July 15, 1948.

Count 2 sets forth that the appellants "did knowingly and wilfully cover up by a trick, scheme and device a material

fact" in an estate tax return; namely, they stamped and caused to be stamped Ferrari's return to indicate that it was received by the Collector on December 2, 1947, whereas it was so received on or about April 22, 1949.

Counts 3, 5, and 7 charge that Cosgrove "did wilfully aid and assist in, and procure, counsel and advise the preparation and presentation" of false and fraudulent estate tax returns of the above-named three decedents "by aiding, assisting, procuring and advising" Doyle to stamp the returns so as to indicate that they were received on the respective fictitious dates set forth above, whereas the returns were actually received on the respective dates specified in Count 1, supra, as the dates on which they were stamped.

Counts 4, 6 and 8 allege that Doyle "did unlawfully and knowingly make and provide an opportunity for * * * Cosgrove to defraud the United States of penalties" in the three estate tax returns, by stamping false dates thereon, as hereinbefore fully set forth, "thereby making and providing an opportunity for * * * Cosgrove to defraud the United States of penalties due thereon in the amount of" $29,239.96, $4,268.34, and $5,087.97 in the Ferrari, Fontana, and Ferrando estate tax returns, respectively. Counts 6 and 8, in addition, charge that Doyle provided Cosgrove with an opportunity to defraud the United States of *interest* as well as penalties, in the Fontana and Ferrando returns, respectively, the amount of the interest being included in the two last figures given above.

2. *Statement Of The Case*

This is the second time that this case has been tried. The first trial started on June 25, 1952, and ended on July 9, 1952. It resulted in acquittals of the appellants on Counts 1 and 2, and in a disagreement on the remaining counts. The second trial commenced on September 22, 1952, and ended on October 3, 1952, with verdicts of guilty against Cosgrove on Counts 3, 5 and 7, and against Doyle on Counts 4, 6, and 8.

In our view of the case, a detailed statement of facts is unnecessary. The appellant Doyle concedes that Cosgrove filed all three returns late, but Cosgrove suggests in his brief that "delinquency of the Ferrari return was debatable". In the very next paragraph, however, Cosgrove admits that the Ferrari return "bears the filing stamp of the Collector's office indicating that it was received or filed December 2, 1947", while "The filing stamp bearing that date was actually placed on the return by deputy collector Doyle on April 22, 1949." The return was due on December 2, 1947. Doyle himself testified that the Ferrari return brought in by Cosgrove on December 2, 1947, was "incomplete", and that he advised the latter that it "should be completed as quickly as possible and the tax paid".

There is no doubt that all three returns were filed late, and that the appellant Doyle stamped them in such a way as to indicate that they had been filed on time.

But the fact of this false stamping is not dispositive of the case.

### 3. *The Applicable Statutes*

Section 371 of Title 18 U.S.C.A., the familiar conspiracy statute, reads in part as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The following is the text of 18 U.S.C. A. § 1001:

"*Statements or entries generally*

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The foregoing two sections were the provisions under which Counts 1 and 2 were brought, respectively. It was on those two counts that the appellants were acquitted.

Counts 3, 5, and 7, under which the appellant Cosgrove was convicted, were based upon 26 U.S.C.A. § 3793(b)(1), which is as follows:

"*Assistance in preparation or presentation.* Any person who willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a false or fraudulent return, affidavit, claim, or document, shall (whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document) be guilty of a felony, and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

The appellant Doyle was convicted under Counts 4, 6, and 8, brought under 26 U.S.C.A. § 4047(e) (5), which reads:

"*Other unlawful acts of revenue officers or agents.* Every officer or agent appointed and acting under the authority of any revenue law of the United States—

\*     \*     \*     \*     \*     \*

(5) Who makes opportunity for any person to defraud the United States;  \*  \*  \*

\*     \*     \*     \*     \*     \*

shall be dismissed from office, shall be fined not less than $1,000 nor

more than $5,000, and be imprisoned not less than six months nor more than three years."

### 4. The Principle Of Res Judicata Applies To Criminal Cases

As late as four decades ago, it was seriously contended before the Supreme Court of the United States that the doctrine of *res judicata* "does not exist for criminal cases except in the modified form of the 5th Amendment, that a person shall not be subject for the same offense to be twice put in jeopardy of life or limb". In the leading case of United States v. Oppenheimer, 1916, 242 U.S. 85, 88, 37 S.Ct. 68, 69, 61 L.Ed. 161, Mr. Justice Holmes finally laid to rest any lingering doubts on this subject when he said:

"The safeguard provided by the Constitution against the gravest abuses has tended to give the impression that when it did not apply *in terms*, there was no other principle that could. But the 5th Amendment was not intended to do away with what in the civil law is a fundamental principle of justice * * * in order, when a man once has been acquitted on the merits, to enable the government to prosecute him a second time." (Emphasis supplied.) [1]

The distinction between a plea of former jeopardy and the principle of *res judicata* should be carefully observed. As the appellee correctly points out, former jeopardy involves an "identity" of offenses, while in "collateral estoppel", one of the "components" of *res judicata*, the prior judgment "is conclusive between the parties * * * only as to matters actually litigated and determined by the judgment".

It was this latter principle that was applied by the Supreme Court in United States v. Adams, 1930, 281 U.S. 202, 205, 50 S.Ct. 269, 74 L.Ed. 807, when it said:

"But although not technically **a** former acquittal, the judgment was conclusive upon all that it decided."

### 5. The Issue Of Conspiracy And That Of Aiding And Abetting Are "So Nearly Identical" As To Give Rise To The Defense Of Res Judicata In Favor Of Cosgrove.

As we have seen, Counts 3, 5, and 7 charge that the appellant Cosgrove "did wilfully aid and assist in, and procure, counsel and advise" the preparation and presentation * * * of a certain false and fraudulent (estate tax) return of (name of decedent) * * * by aiding, assisting, procuring, and advising * * * Doyle to stamp the said * * * Return", etc.

The appellee has taken an inconsistent position regarding the nature of the offense charged in the above three counts, as well as regarding the nature of the statute under which the counts were laid. In one section of its brief, it argues that "An acquittal of conspiracy to commit a substantive offense is no bar to a later prosecution * * * for aiding and abetting the commission of the substantive offense." Later in its brief, however, the appellee contends that Cosgrove was indicted "as a principal, not as an aider and abettor", and still later, the appellee flatly declares that 26 U.S.C.A. § 3793(b) (1), under which the three Cosgrove counts were brought, "is not an aider and abettor statute". Finally, in his argument before the jury, counsel for the appellee argued that the statute under which the appellant Cosgrove was indicted "is commonly referred to as the 'aid (sic) or abettor' statute".

Regardless of the appellee's inconsistent contentions, however, both the statute and Counts 3, 5, and 7, brought thereunder, contain the words "aid", "assist", "procure", "counsel", and "advise". It requires *no expert in semantics* to dis-

---

1. See also Frank v. Mangum, 1915, 237 U.S. 309, 333–334, 35 S.Ct. 582, 59 L.Ed. 969; United States v. De Angelo, 3 Cir., 1943, 138 F.2d 466, 468–469; People v. Darnell, 1950, 97 Cal.App.2d 630, 636, 218 P.2d 172; People v. Mora, 1953, 120 Cal.App.2d 896, 262 P.2d 594.

cern the partial *identity* and the substantial *equivalence* of those words with the words "aid and abet".

█ In its attempt to establish that Section 3793(b) (1), supra, "is not an aider and abettor statute", the appellee argues that "Its purpose is to reach the advisers of taxpayers who prepare returns", citing United States v. Borgis, 7 Cir., 1950, 182 F.2d 274, 277, and United States v. Kelley, 2 Cir., 1939, 105 F.2d 912, 917. While the primary purpose of the statute may well have been to reach venal advisers of innocent taxpayers, there is nothing either in the two cited cases or in the law itself that indicates a Congressional purpose to exempt from the statutory ambit advisers of individuals like the chief office deputy of the Collector of Internal Revenue at San Francisco.

█ The only exception is that the *taxpayer* need not share the unlawful intent, in order to make the other party an aider and abettor. By necessary implication, all others must harbor such intent if the statute is to apply. *Expressio unius est exclusio alterius.*

In other words, the section in question presupposes that, with this one exception, the person who is aided must concur in the "falsity or fraud", just as every conspirator must share in the unlawful intent. In this respect, the parallelism between aiding and abetting on the one hand, and conspiracy on the other, is complete.

█ In an effort to escape the bar of the conspiracy acquittal, the appellee presses the argument that "It is impossible to know whether the acquittal stemmed from a finding that the appellants did not agree with each other, or a finding that one or the other, or both, lacked an intent to defraud."

Precisely the same argument could be made in a case in which, after a conspiracy acquittal, the appellee brought in *another* conspiracy indictment on the same facts. It could then be argued, as the appellee now argues, that "It is impossible to know whether the acquittal stemmed

from a finding that the appellants did not agree with each other, or," etc. Would the appellee therefore be permitted two bites at the conspiracy cherry?

The crucial question here, therefore, is whether the conspiracy issue in the earlier trial and the aiding and abetting issue involving Cosgrove here, are "so nearly identical as to prevent a retrial". Williams v. United States, 5 Cir., 1950, 179 F.2d 644, 650, affirmed, 1951, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758.

The close relationship between conspiracy and aiding and abetting was clearly recognized by the Supreme Court in Pinkerton v. United States, 1946, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L. Ed. 1489, rehearing denied, 1946, 329 U.S. 818, 67 S.Ct. 26, 91 L.Ed. 697:

"The criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise. *The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle.*" (Emphasis supplied.)

In Johnson v. United States, 9 Cir., 1932, 62 F.2d 32, 34, cited with approval by the Supreme Court in Pinkerton v. United States, supra, 328 U.S. at page 647, 66 S.Ct. at page 1184, the late Judge Sawtelle said:

"The evidence shows that the parties were associated together for the illegal purpose of manufacturing intoxicating liquor, and any act done by one or more of the parties to accomplish that purpose was the act of all. *And this is true regardless of the fact that counts 2, 3, and 4 do not directly charge a conspiracy.* 18 U.S.C.A. § 550. That section is as follows: '§ 550. (Criminal Code, section 332.) "Principals" defined. Whoever directly commits any act constituting an offense defined in

any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal.'

"The evidence is sufficient to sustain the verdict of guilty on such last mentioned counts. The fact that these appellants were not personally present at the place where and the time when the liquor was manufactured is immaterial. It is not necessary that one who *aids and abets* the commission of a crime shall be present when the crime is committed to sustain a conviction under this section. The jury necessarily found against appellants' contention that they had abandoned the unlawful enterprise. Having voluntarily entered into the undertaking *and aided and assisted* its execution, they are responsible for the consequences." (Emphasis supplied.)

By coincidence, another case entitled Johnson v. United States, 8 Cir., 1952, 195 F.2d 673, 675, likewise brings out the close similarity between a conspiracy and an aiding and abetting. There the Court used the following language:

"Generally speaking, to find one guilty as a principal on the ground that he was an aider and abetter it must be proven that he shared in the criminal intent of the principal *and there must be a community of unlawful purpose at the time the act is committed.*" (Emphasis supplied.)

Furthermore, there is a definite affinity between the concept of conspiracy on one hand, and the concepts of concert of action and aiding and abetting on the other. In 8 Words and Phrases, page 509, we find the following:

"Concert of action must be based upon a conspiracy to commit an illegal act, and one who aids and abets in commission of crime must share in criminal intent of actual perpetrator of criminal act. Whited v. Commonwealth, 6 S.E.2d 647, 649, 174 Va. 528."

And in the Cumulative Annual Pocket Part of Volume 3 of the same work, the following statement is made:

"One is an 'aider and abettor' in the commission of any crime if he is an active partner in the intent which was the crime's basic element, and the least degree of concert or collusion between the parties to an illegal transaction makes act of one the act of all. Com. v. Lowry, 374 Pa. 594, 98 A.2d 733, 736."

In American Tobacco Co. v. United States, 6 Cir., 1944, 147 F.2d 93, 107, the Court said:

"No formal agreement is necessary to constitute an unlawful conspiracy. Almost always, the crime is a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose. (Cases cited.) The agreement may be shown by a concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose. (Case cited.)"

In affirming the American Tobacco Co. case, supra, the Supreme Court, in 328 U.S. 781, 809–810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575, said:

"Where the conspiracy is proved, as here, from the evidence of the action *taken in concert* by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. (Case cited.) Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." (Emphasis supplied.)

Finally, this entire question has been put beyond cavil by the Supreme Court, in Sealfon v. United States, 1948, 332 U.S. 575, 578–580, 68 S.Ct. 237, 92 L.Ed. 180. The facts in that case were briefly these:

Two indictments were returned against Sealfon and others, including a group hereinafter referred to simply as "Greenberg". One charged conspiracy to defraud the United States of its governmental function of conserving and rationing sugar by presenting false invoices and making false representations to a ration board to the effect that certain sales of sugar products were made to exempt agencies. The other indictment charged Sealfon and Greenberg with the commission of the substantive offense of uttering and publishing as true the false invoices.

The conspiracy indictment was tried first, and the following facts were shown:

Greenberg, who manufactured syrup, approached a salesman for a brokerage concern, to sell vanilla syrup. The salesman negotiated some sales to Sealfon, who did a wholesale business. Thereafter Greenberg asked the salesman to get a list from Sealfon showing the places where Sealfon made sales, and told the salesman that if any sales were made to exempt agencies, Greenberg could sell to Sealfon in larger quantities. The salesman so informed Sealfon, and some time thereafter the latter wrote to Greenberg saying, "At the present time some of our syrups are being sold at the Brooklyn Navy Yard" and various defense plants. Sealfon did sell some of his syrup to a vending company which had machines at the Navy Yard but it was not vanilla syrup *and no sales were made to the Navy Yard as such.*

Greenberg thereafter presented false invoices to the ration board, purporting to show sales to Sealfon for delivery to the Navy Yard. Sealfon's letter was never shown to the board.

On the basis of the false invoices, Greenberg received replacement certificates for 21,000,000 pounds of sugar, 10,000,000 of which he sold to Sealfon in the form of vanilla syrup, which Sealfon sold to non-exempt consumers, chiefly the National Biscuit Company. Sealfon at first made payments to Greenberg by check, but later gave checks to the truckers, which the latter cashed, deducted their trucking fees, and paid Greenberg.

Greenberg pleaded guilty. The jury returned a verdict of not guilty as to Sealfon. Thereafter a trial was had on the *other* indictment. Greenberg again pleaded guilty, and the trial proceeded against Sealfon on the theory that he *aided and abetted* Greenberg in the commission of the *substantive* offense.

The false invoices, the letter from Sealfon to Greenberg, and essentially the same testimony were again introduced against Sealfon. In addition, it was brought out on cross-examination that Sealfon had unsuccessfully sought replacement certificates from his ration board for sugar contained in syrups sold at the Navy Yard and defense plants.

Greenberg gave testimony from which the jury could conclude that Sealfon was a moving factor in the scheme to defraud that was constructed around Sealfon's letter, and that Sealfon was familiar with Greenberg's intention to submit false invoices. Greenberg further testified that Sealfon received $500,000 in cash under the agreement, as a rebate of two cents a pound on all replacement sugar that Greenberg received on Navy Yard invoices, whether or not it was used in syrup sold to Sealfon.

This time the jury returned a verdict of guilty against Sealfon, who moved to quash the second indictment on the ground, *inter alia*, of res *judicata.* He also objected to the introduction of the evidence adduced at the first trial.

With these facts before it, the Court said:

"It has long been recognized that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. (Case cited.) Thus, with some exceptions, one may be prosecuted for

both crimes.. *Ibid.* But *res judicata* may be a defense in a second prosecution. That doctrine applies to criminal as well as civil proceedings (cases cited.) and operates to conclude those matters in issue which the verdict determined though the offenses be different.

"Thus the only question in this case is whether the jury's verdict in the conspiracy trial was a determination favorable to the petitioner of the facts essential to conviction of the substantive offense. That depends upon the facts adduced at each trial and the instructions under which the jury arrived at its verdict at the first trial."

In the instant case, the appellee insists that "on the basis of the evidence and instructions at the first trial, it cannot be determined what issues were decided by the verdict and judgment on count 1." There is also suggested a spate of possibilities as to what "the jury might have thought", and, finally, we find the somewhat startling comment that acquittal on Count 1 "may only show that the jury did not speak its real convictions on the first count, or may have compromised or made a mistake"!

This type of argument was made by the present appellee in the Sealfon case [332 U.S. 575, 68 S.Ct. 239] and was thus disposed of by the Supreme Court:

"Respondent argues that the basis of the jury's verdict cannot be known with certainty, that the conspiracy trial was predicated on the theory that petitioner [Sealfon] was a party to an over-all conspiracy ultimately involving petitioner, Greenberg, and the Baron Corporation [which had pleaded nolo contendere at the first trial]. Thus it is said that the verdict established with certainty only that petitioner was not a member of such conspiracy, and that therefore the prosecution was not foreclosed from showing in the second trial that petitioner wrote the letter pursuant to an agreement with Greenberg to defraud the United States. The theory is that under the instructions given the jury might have found that petitioner conspired with Greenberg and yet refused to infer that he was a party to the over-all conspiracy.

"The instructions under which the verdict was rendered, however, must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings. We look to them only for such light as they shed on the issues determined by the verdict. (Case cited.) Petitioner was the only one on trial under the conspiracy indictment. There was no evidence to connect him directly with anyone other than Greenberg. Only if an agreement with at least Greenberg was inferred by the jury could petitioner be convicted. And in the only instruction keyed to the particular facts of the case the jury was told that petitioner must be acquitted if there was reasonable doubt that he conspired with Greenberg. Nowhere was the jury told that to return a verdict of guilty it must be found that petitioner was a party to a conspiracy involving not only Greenberg but the Baron Corporation as well. Viewed in this setting, the verdict is a determination that petitioner, who concededly wrote and sent the letter, did not do so pursuant to an agreement with Greenberg to defraud."

In passing, we might observe that in the instant case we are not troubled with the theory of an "over-all conspiracy" embracing a smaller conspiracy. Here the defendants in the two trials were *identical.*

Reversing the judgment of conviction against Sealfon on the second indictment, trial on which, as we have seen, proceeded on the theory that he *aided and abetted* Greenberg in the commission of the *substantive* offense, the Supreme Court said in conclusion:

"So interpreted, the earlier verdict precludes a later conviction of the substantive offense. The basic

facts in each trial were identical. As we read the records of the two trials, petitioner could be convicted of either offense only on proof that he wrote the letter pursuant to an agreement with Greenberg. Under the evidence introduced, petitioner could have *aided and abetted* Greenberg in no other way. Indeed, respondent does not urge that he could. Thus the core of the prosecutor's case was in each case the same: the letter, and the circumstances surrounding it and to be inferred from it, and the false invoices. There was, of course, additional evidence on the second trial adding detail to the circumstances leading up to the alleged agreement, petitioner's participation therein, and what he may have got out of it. But at most this evidence only made it more likely that petitioner had entered into the corrupt agreement. *It was a second attempt to prove the agreement which at each trial was crucial to the prosecution's case* [as here] *and which was necessarily adjudicated in the former trial to be non-existent. That the prosecution may not do.*" (Emphasis supplied.)

Here, too, the "agreement" between the defendants was "crucial". After a study of the record, we are convinced that the facts in the instant case are sufficiently close to those of Sealfon to make the law of that decision controlling here, so far as the appellant Cosgrove is concerned.

█ There is an additional reason why prosecution on Count 3 is barred under the doctrine of *res judicata*. Count 3 alleges that Cosgrove assisted, counseled, etc., Doyle to datemark the Ferrari estate tax return falsely. Count 2, on which both appellants were acquitted, alleged that Doyle and Cosgrove did the false datemarking on this same Ferrari return. Although different statutes are involved, the offenses charged in Counts 2 and 3 are essentially the same.

6. *Since The Offenses Alleged Against The Appellant Doyle In Counts 4, 6 and 8 Are Substantially Different From Those Charged In Counts 1 and 2, He Cannot Rely Upon the Defense of Res Judicata*

We need not labor the legal principles applicable to Counts 4, 6 and 8, on which the appellant Doyle was convicted. These charged him with providing "an opportunity" for Cosgrove to defraud the United States of penalties, or penalties together with interest, in connection with the three estate tax returns, supra. In none of these three counts is there any allegation that the appellant Cosgrove availed himself of the venal opportunity thus provided by Doyle. There was therefore presented no question of conspiracy, aiding and abetting, concert of action, or the like. To paraphrase the poet Kipling, the crimes with which Doyle was charged were those that could be committed "one by one", and not "two by two".

Doyle also contends that "the fourth count of said indictment charging the false date in connection with the estate of Luigi Ferrari is the same false date and estate tax return that was the subject matter of the second count of said indictment upon which the appellant was acquitted."

A glance at the two counts, however, discloses that the appellant Doyle is similarly in error. Count 2 charges that *both* appellants "did knowingly and wilfully cover up by a trick, scheme and device a material fact" in the Ferrari estate tax return, while, as we have just seen, Count 4 charges that Doyle provided an "opportunity" for Cosgrove to defraud the United States in the Ferrari matter. Here again, the two allegations are clearly different: the former sets forth that *both* appellants *actually succeeded* in covering up a material fact, while Count 4 avers that Doyle *alone* simply provided Cosgrove an *opportunity* for defrauding the United States, without alleging whether or not Cosgrove took advantage of that opportunity.

Finally, the appellant Doyle complains briefly regarding the instructions given by the Court below. This appellant has

disregarded our Rule 18(d), which provides, inter alia, that "When the error alleged is to the charge of the court, the specification shall set out the part referred to totidem verbis, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial." Nevertheless, we have considered Doyle's objections to the instructions, and find them wholly without merit.

### 7. *Conclusion*

In view of the appellant Cosgrove's former acquittal on Counts 1 and 2, the judgment against him on Counts 3, 5, and 7 is reversed, because of the application of the doctrine of *res judicata.*

That doctrine, however, cannot be successfully invoked on behalf of the appellant, Doyle, since Count 1 charged conspiracy and Count 2 alleged joint action by the two appellants, while Counts 4, 6, and 8 dealt with substantive offenses committed by Doyle alone. The judgment against Doyle on said counts is affirmed.

HEALY, Circuit Judge (concurring in part and dissenting in part).

This is an unusually simple case on its facts. It involves three estate tax returns prepared by appellant Cosgrove for three of his clients. Cosgrove filed these returns, with remittances, in the office of the Internal Revenue Collector at periods varying from seven months to seventeen months after the date they were due under the relevant revenue statute. In each instance appellant Doyle, a deputy collector, stamped the returns as having been received with remittances as of the date they were due. A money penalty is exacted by the statute for the late filing of such returns.

A single indictment was found by the grand jury accusing both Cosgrove and Doyle of offenses predicated on the aforementioned activities. In count one the two were charged jointly with conspiracy to defraud the government of the penalties. Count two charged them jointly with feloniously covering up the late filing by the trick and device of pre-

dating. There were six other counts, accusing the two men separately. Three of these charged Cosgrove with feloniously aiding and abetting Doyle in the predating of the returns. Three charged Doyle with feloniously affording Cosgrove an opportunity in each instance to defraud the government of the penalties by his (Doyle's) predating of the returns. Thus in the transactions charged the two men complemented each other. They were like the opposite faces of the same shield.

On the first trial both were acquitted on counts one and two. In respect of the counts accusing them separately the jury disagreed. On the present trial the jury found the two men guilty on each of the counts separately levelled against them. The question before us is whether the prior acquittal on the conspiracy charge is res judicata as regards either or both men in respect of the separate charges of which they were severally found guilty by the second jury. My associates are of opinion that as respects Cosgrove the prior verdict of acquittal operated as res judicata. With this determination I agree. But they hold that as respects Doyle the legal principle is not applicable. With this view I am obliged to disagree.

The case on the present trial can not rationally be fragmented as the majority undertake to do. Its constituent parts do not permit of separate consideration. Manifestly when the jury convicted both men, it found that Cosgrove had the necessary criminal intent and had agreed with Doyle that the overt acts be done, and that Doyle likewise had a criminal intent and had agreed with Cosgrove to do the overt acts. Thus the determination by the second jury is necessarily inconsistent with the determination of the first, although it is impossible to ascertain whether the inconsistency lies with the conviction of Doyle or of Cosgrove, or of both. This view seems to me the only one in harmony with the Supreme Court's holding in the Sealfon case. As I read Sealfon, the doctrine of res judicata serves to nullify a conviction or con-

victions based on determinations of fact contrary to the determination of a prior jury. Accordingly, in my opinion, neither conviction here can stand.

## On Rehearing

HEALY, Circuit Judge.

In a decision of this court of a year ago, involving charges against appellants Lloyd J. Cosgrove and Paul V. Doyle, the judgment of conviction as against Cosgrove was reversed and that as against Doyle affirmed, one member of the court dissenting. Doyle petitioned for a rehearing and his petition was granted, the author of the original opinion dissenting. The case as pertaining to Doyle has now been reargued and is again before us for decision.

In the original opinion the nature and history of the case were fully developed and the pertinent statutes quoted, so that it is unnecessary again to plow that field at any great length. Enough to say that the two men were charged with conspiracy to defraud the government of penalties in connection with the late filing of estate tax returns in the cases of three separate estates. Doyle was an official of the Internal Revenue office with which the returns were filed and Cosgrove the attorney responsible for filing them. On an earlier trial a jury had found the men not guilty in respect of the two counts of the indictment charging them with conspiracy to defraud and jointly to cover up and conceal by scheme and device the late filing by Cosgrove of the returns. The jury were unable to reach an agreement with respect to the substantive charges against the men pertaining to the three returns. In a second trial before another jury Cosgrove and Doyle were found guilty of these substantive charges separately leveled against them. This court reversed as to Cosgrove for the reason that his former acquittal rendered the charges against him res judicata. But as to Doyle the acquittal was held not to constitute an adjudication.

The government did not ask for a rehearing in respect of the freeing of Cosgrove, nor did it seek certiorari. Accordingly the ruling as regards Cosgrove stands as the law of the case and we treat it for present purposes as controlling. We are of opinion that the ruling requires a reversal of the conviction in the case of Doyle as well.

In our former opinion, so far as Doyle was concerned, attention was given only to the barren letter of the indictment, and even its letter was in material part not taken into account. The evidence and the practicalities of the situation were ignored. Such treatment affords an inadequate approach to the problem of res judicata. Compare Sealfon v. United States, 332 U.S. 575, 68 S.Ct. 237, 239, 92 L.Ed. 180.[1] The court's assumption, indulged for purposes of decision, was that Doyle operated in a vacuum, whereas the record made on the trial shows that the whole thrust of the gov-

---

1. Sealfon v. United States is the most recent as well as the most nearly analogous authority on the subject of res judicata in criminal cases. There the Court noted that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses, and thus, with some exceptions, one may be prosecuted for both crimes. "But," said the Court, "res judicata may be a defense in a second prosecution. That doctrine applies to criminal as well as civil proceedings [citing cases] and operates to conclude those matters in issue which the verdict determined though the offenses be different." The Court thought that the only question in the case before it was whether the jury's verdict in the conspiracy trial was a determination favorable to the petitioner of the facts essential to conviction of the substantive offense. "This depends," said the Court, "upon the *facts adduced at each trial* and the instructions under which the jury arrived at its verdict at the first trial." The Court further observed that "The instructions under which the verdict was rendered, however, must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." [Emphasis supplied.]

ernment's evidence and argument was toward establishing the proposition that what he did was done through prearrangement with Cosgrove and by concerted action between the two men.[2] Indeed, concert of action and mutuality of purpose are implicit in the substantive charges of which Doyle was convicted, no less than in those of which Cosgrove was found guilty. And it is likewise clear from the evidence that Cosgrove did in fact undertake to avail himself of the opportunity Doyle is alleged to have afforded him.

The record on the first trial shows that the two counts of which Cosgrove and Doyle were then acquitted contained every element charged against them in the substantive counts. The basic facts in the two trials were identical. If the prior verdict of acquittal of the two men was res judicata as to Cosgrove, it was res judicata as to Doyle as well. Our holding to the contrary affronts reason; and we feel that what is not good sense ought not be perpetuated as law.

The conviction of Doyle is accordingly reversed.

LEMMON, Circuit Judge (dissenting).

For the reasons stated by me in the original majority opinion, I dissent from the present opinion on rehearing.

I do not believe that the distinction between a conspiracy to commit a crime, on the one hand, and a unilateral offer of an opportunity to another to commit that crime, on the other hand, "affronts reason".

The law is full of salutary distinctions that the courts are required to observe. I believe that the distinction in question is one of them.

The judgment should be affirmed as to the appellant Doyle.

2. The government's position on the second trial was made abundantly clear at the outset thereof. In the opening statement of the United States attorney, outlining the issues for the enlightenment of

the jury, he said that in order to avoid the penalties "Mr. Cosgrove procured Mr. Doyle" to date the returns as having been filed as of the date they were due.