[Crim. No. 5320.   Second Dist., Div. One.   May 16, 1955.]

THE PEOPLE, Respondent, v. JOHN CHARLES
VON HECHT, Appellant.

Charles Hollopeter and William B. Esterman for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendant was accused of the crime of attempted grand theft in that he wilfully,

unlawfully and feloniously attempted to take certain personal property of Robert Arnett and Firestone Stores.

Following entry of a not guilty plea trial by jury was waived and it was stipulated that the cause might be submitted on the transcript of the preliminary examination; that the exhibits received thereat might be admitted in evidence, and that further testimony might be submitted. Defendant reserved the right to object to certain testimony in the aforesaid transcript and to certain exhibits on the claimed ground of their immateriality and irrelevancy.

The court read the transcript of the preliminary examination, received certain exhibits in evidence and further testimony was offered by defendant and by the People in rebuttal.

Defendant was adjudged guilty of the crime charged against him in the information. His motion for a new trial was denied. Proceedings were suspended and he was granted conditional probation. From the order denying his motion for a new trial defendant prosecutes this appeal.

As to the factual background surrounding this prosecution, we regard the following as a fair epitome thereof:

On February 19, 1954, at the Union Oil Company station in Palo Alto, California, Joseph H. Ronan of Santa Cruz, California, lost the national Union Oil Company credit card, No. 5398-T-18, which had been issued to him. The next day, he reported that loss to the Union Oil Company. He was not acquainted with the defendant, and did not give him or anyone else permission to gain credit by the use of his credit card.

On February 23d, Margaret Callahan, 511 South Fifth Avenue, Arcadia, whose husband worked at the Broadway-Pasadena, noticed that her California license plate, 2R16134, and its holder, were gone from her 1953 Buick, which had been in the Broadway parking lot.

About 2:30 p. m. on May 6, 1954, the defendant drove a Lincoln Capri automobile into the Firestone Store at 1100 East Colorado, Pasadena. He and Mr. Arnett, the office and credit manager of the store, discussed a sunvisor, and then talked about tires. The defendant noticed some wire wheels which the store had on display. Mr. Arnett told him that the price was $385, and showed him how they worked. The defendant said that he wanted a set of the wire wheels, and wanted them put on a Union credit card, stating something about its being an expense item where he worked. He handed Mr. Arnett a Union Oil Company credit card, from which

Mr. Arnett, with the defendant watching, took the information and made out a work order for the wheels, oil, filter, and "lube," placing on that order the name "Joe P. Ronan" and the number "5398-T-18." Mr. Arnett had the credit card just long enough to copy it, and he gave it right back. He told the defendant to return about 5 o'clock. The defendant took his brief case and said that he was going to his office, but would be back about 5 o'clock to pick up the car. After he had gone, Mr. Arnett called the Union Oil Company.

Officer Hoocker of the Pasadena city police department first saw the defendant's car on May 6th about 3:30 p. m. on a grease hoist at the Firestone Store in Pasadena. On it was California license plate 2R16134—taken from Mrs. Callahan's vehicle—and 1954 tab No. 1993889.

Officer Hoocker saw the defendant for the first time walking west on the south side of the street at about 1140 East Colorado Street, Pasadena, three or four lots east of the Firestone Store. The defendant walked farther west on the sidewalk, picked up a brown brief case from the sidewalk there, then continued into the service station. It was some time after 4 o'clock and before 5 o'clock when he returned to the station. The car was up on the grease rack, and the wheels had not been installed, when he returned. He was placed under arrest by Officer Hoocker who told him that he was being held for investigation of forgery because they had a report that a man with the car which was on the grease rack had tried to buy merchandise on a Union Oil Company credit card that had been reported stolen, and that there was a stolen license plate on the rear of the automobile. The defendant said that he didn't know how the license plate got on the back of the automobile, and that the "deal" there was for cash—that he didn't have a Union Oil Company credit card.

Officer Hoocker asked the defendant if he had a key for the glove compartment and for the trunk of the car, and the defendant gave him the key from his key case. The officer opened the glove compartment and therein found a temporary receipt of the California Department of Motor Vehicles, showing validation on March 11, 1954, containing the defendant's name John Charles Von Hecht "6114H," and in boxes under "Issued" the number "1993889" in the box beside the word "Tab" and the number "1J60712" in the box beside the word "Plate."

In the glove box also there were three Union Oil Company

sales slips filled in in handwriting. One showed a sale at a station at 10th and Mission, "S.F." on the "4/12" to "Von Hecht," license "1J60721" of 14.4 gallons of 7600 gasoline at 33.7, amounting to $4.83; 6 Royal Triton at $.60 amounting to $3.60, "Lub" in the amount of $1.75, wash in the amount of $1.75 and filter in the amount of $2.05, with sales tax of $.20, totalling $14.18. A second sales slip showed a sale on "4/18/54" at the Master Service Station, Salem, Oregon, to "54 Lincoln" license "1J60721," of 13.5 gallons of 7600 gasoline at 34.1, amounting to $4.70, 5 Royal Triton at $.60, amounting to $3.00, "AC Service" amounting to $.75, "Lube" amounting to $1.75, wash amounting to $2.00, wheel pack amounting to $2.00, and screen amounting to $.98, totalling $15.18. A third sales slip showed a sale at Robert C. Hall, 5477 San Fernando Road, Glendale on "4/8/54" to "John Von Hecht," license "1J60721," of four United States Royal Masters at $64.20 "exch" each, amounting to $256.80, four United States Royal Lite Tubes at $25.09, amounting to $100.36, with excise tax of $9.80 and sales tax of $14.14, totalling $381.10, with a notation "Cash." Officer Hoocker asked the defendant about the sales slips and the latter said that he had written them himself for expense records, and that he did not get the tires and tubes in Glendale, but had obtained them in Oregon and made the slip for tax records.

In the defendant's brief case the officer found a document labelled "State of Oregon Department of State Police," dated "4/27/54," containing the defendant's name, age, address and other data, and showing "Vehicle 54 Linc Cch," "License Calif. 2R16134," which the defendant said was a warning ticket which he had received while driving his car in the State of Oregon.

Wrapped in a towel in the trunk of the defendant's car Officer Hoocker found two license plates numbered 1J60712.

On May 7, 1954, Officer Hoocker and Rittenhouse and the defendant had a conversation. The officers asked the defendant if a ledger book and a personal expense book contained his entries and he said that they did. The latter told them about the Union Oil Company sales slips being kept by him for tax records. Officer Hoocker asked the defendant what he had done with the Union Oil Company credit card he had presented at the Firestone Store and the defendant said that he didn't have one—that he had never had one.

On May 8, 1954, Officer Repetti of the Pasadena Police Department found the "Joseph H. Ronan" credit card and

another Union Oil Company credit card between pages 496 and 497 of the Northeastern telephone directory in the rear of a cocktail lounge at 1154 East Colorado.

The original records of the Union Oil Company contained certain credit card delivery tickets each showing "5398-T-18" as the "Customer's Credit Card Account No." and "Joseph H. Ronan" as the person to whom the sale was made. One ticket from the 10th and Mission Parking Station, 10th and Mission Streets, dated "4/12/54," showed a license number of R41483, the space before the R being written over by a writing from a lower line. The ticket was written up for 14.4 gallons of 7600 gasoline at 33.7, amounting to $4.83; "6/4" Royal Triton Motor Oil at .60, amounting to $3.60; "Lub" in the amount of $1.75; wash in the amount of $1.75; and filter in the amount of $2.05, with sales tax of .20, totalling $14.18. A second ticket from the Master Service Station, Salem, Oregon, showed a license number of "2B1613," a date of "4/17/54," and a sale of 13.5 gallons of 7600 gasoline at 34.4, amounting to $4.70; 5 of Royal Triton Motor Oil at .60, amounting to $3.60, "Lub" in the amount of $1.75; wash in the amount of $2.00; wheel pack in the amount of $2.00; "AC Service" in the amount of $.75; and screen in the amount of $.98, totalling $15.18. A third such ticket
R16134
showed the license written as 2B61143 and the date as "4/1/54." It was from D. O. Stewart, Portland, Oregon, and was for 4 United States Royal Masters at $64.28, amounting to $256.80; excise tax of $9.80, and four tubes at $25.09, amounting to $100.36, totalling $366.96. In the space provided on each ticket for "Rec'd by" there appeared a series of pencil marks.

In his own behalf defendant testified that on May 6, 1954, he was employed by Universal Publicizers, Inc., as a sales manager. The work consisted of selling advertising on radio and television to local merchants. During March and April, he had working for him on a probationary basis as a salesman a person representing himself to be Joseph Ronan. Ronan did not have a car, and when he worked he used the car either of the defendant or of another salesman named Ferrar. Somtimes Ronan bought materials and services for the defendant's car, and sometimes in so doing he used the Union Oil Company credit card containing the name of Joseph H. Ronan and the number 5398-T-18. When Ronan did this, the defendant gave Ronan the cash for the services and ma-

terials furnished for his car and bought with the credit card, and made out a duplicate of the receipt Ronan had received in each such transaction, on sales slips, blanks of which he had picked up, so that he could use them in his income tax.

That he bought a set of tires from Ronan about April 1st while they were in Portland or Vancouver. He paid him half price for them, and did not know where Ronan got them. He did not see any charge slip for them. When he bought them, he had Ronan sign a receipt for the money he paid him, and had it witnessed by Mr. Ferrar. That he looked up the retail price of the tires and put that amount down on a blank sales slip which had "Robert C. Hall, L1930, 5744 San Fernando Road, Glendale" stamped on it, for income tax deduction purposes, adding a sales tax which he had not in fact paid. That the other sales slips were made by copying credit card delivery tickets, duplicates of which Ronan had showed him.

Defendant further testified that license plates numbered 1J60712 or 21 were issued to him for his Lincoln, with, he presumed, tab number 1993889. He did not remove the plate numbered 2R16134 from any other vehicle, and did not find it anywhere. He was in San Jose from February 21st to 27th, 1954. He never paid any attention to the number of his license plate, and had no conscious knowledge that the plate with number 2R16134 was on his car. He had no idea how it got on his car, and he did not know how his own license plates got into the trunk of his car.

That about May 1st, Ronan went to see the defendant at Lido Village where he and his wife had a house trailer. Ronan said that he was on his way to Florida. That Ronan, who owed the defendant about $400, said that he would give the latter his credit card as security for the money he owed him. The defendant objected because he did not believe that it would be security. Then Ronan, who was going to be gone for a month, said that if the defendant used the card he should sign his own name so Ronan would know which purchases were the defendant's, and Ronan would deduct the amount that the defendant had spent from what he owed and pay him the balance.

That after he got the credit card from Ronan, he did not use it to charge any gasoline or oil or anything. On May 6, 1954, he was in Pasadena, where he went to the Firestone Store to get a sunvisor, as he had some time to spend in that town before he had to go to an appointment. He looked at

sunvisors and ordered a lubrication job and an oil change on his car, which he had parked in the station. He and Mr. Arnett discussed wire wheels for the Lincoln. That he told Mr. Arnett that he wanted wire wheels, which would cost about $400, and gave Mr. Arnett the ''Ronan'' credit card, intending to charge the wheels on the credit card and ''get even all in one charge with Mr. Ronan.'' He was not asked what his name was. Mr. Arnett was behind the desk writing, but the defendant did not watch what he was writing on the order. He did not see a copy of the work order, and did not know that the number of the credit card was written on it. He did not sign the work order nor any other document. Mr. Arnett said that he was to return for the wheels at 5 o'clock. That he then left the station.

Defendant further testified that after he departed from the station he started to think about the transaction, and it occurred to him that if Ronan could not pay him the money he owed him, he did not see how Ronan could pay for the wheels. He was not familiar with the legal aspects of the thing, but he thought that there was a good possibility that he could get into trouble for using Ronan's credit card. The more he thought about it the more he wanted to stop the transaction. If he had to pay for the wheels he would do so, but if he got back to the station early, he could tell them that he had changed his mind and did not want the wheels, thus saving himself the expense. He started back to the station.

As he was approaching the service station he decided that he didn't even want to take the credit card in with him. He knew that if he didn't have it he could not charge anything, as his experience had been that one could not get delivery without the card. He put his brief case on the sidewalk, as it was heavy, and went into a bar, where he tried to telephone to a man in Reno on a business matter. He put the credit card between the pages of the Northeast telephone directory so that he could come back and get it and mail it to the address on it. He did not put anything else in the telephone directory. As far as he knew there was no Union Oil Company credit card with the name of Joseph T. Wills on it in the directory at that time.

That he returned to the station early, at about 3:30 o'clock, to cancel the order if he could and pay for the wheels in cash if he could not. He had a sufficient bank balance to do so. When he returned, he saw Officer Hoocker there and thought that he worked there. He told Officer Hoocker that he was going to pay cash for whatever he bought there, as that was his in-

tention when he returned. That when Officer Hoocker asked him if he had a Union Oil credit card he told him that he did not have any. At the time, he had a Shell Oil Company credit card.

On cross-examination defendant was shown a series of photostatic copies of the documents, each imprinted "Union Oil Company of California." Each ticket showed a sale to "Joseph H. Ronan" on credit card "5398-T-18." On each, in the space provided for the name of the person by whom the merchandise was received was a penciled series of marks. As to some of them defendant testified he did not make the purchases reflected thereon, while as to others he did not recall whether or not he had made the purchases. That as to the stolen license plate No. 2R16134 which was on his vehicle when he was arrested, he paid no attention to it but "assumed" that at some time when his employee Ronan borrowed defendant's automobile he placed the license plate on it.

In rebuttal, Joseph H. Ronan of Santa Cruz, to whom the credit card here in question was issued, testified that he did not make a purchase at the 10th and Mission Parking Station in San Francisco on April 12, 1954, and did not authorize anyone to make a purchase. The credit card delivery ticket showing a sale to his name on that date at that station was not his. He did not make a purchase in Salem, Oregon on April 17, 1954, and did not authorize anyone else to use his credit card or to make a purchase in his name on that date in Salem. He did not make a purchase in Portland, Oregon, on April 1, 1954, at the D. O. Stewart Service Station, nor authorize anyone to do it. The signatures on the credit card delivery tickets showing sales to his name on those dates and in those places were not his. He wrote his name out.

Mr. Ronan saw other Union Oil Company credit card delivery tickets when they came in on his duplicate bill from the oil company. He was not in the territory shown on the tickets at the times indicated thereon, and did not authorize anyone to make any purchases on his credit card.

Officer Repetti found a Union Oil Company credit card made out to Joseph T. Wills and numbered 3416-x-25, on May 8, 1954, at 1154 East Colorado Street, Pasadena, between pages 496 and 497 of the Northeastern directory in the rear of the establishment there, which was about 100 yards from the Firestone Store. It was with the "Joseph H. Ronan" card which he found also at that time.

The records of the Union Oil Company showed that Joseph T. Wills reported his credit card missing, April 13th, 1954.

With reference to this last-mentioned credit card, lost by Mr. Wills, there was testimony that on April 1, 1954, defendant entered the service station of D. O. Stewart, in Portland, Oregon, and purchased some tires. During this transaction Mr. Stewart's dinner was delivered to him. Defendant told the latter to eat his meal and that he (defendant) would write up the sale. Mr. Stewart handed defendant his book and the latter wrote the order in it, putting the "Joseph H. Ronan" credit card beside it. Mr. Stewart checked the number and name written on it and saw that they corresponded with the name and number on the credit card. However, as defendant drove his Lincoln automobile out of the service station he stopped before crossing the sidewalk to go into the street. At that time Mr. Stewart observed that the license plate on the vehicle was "2R16134" (the plate stolen from Mrs. Callahan) and not "2B61143" as the defendant had written it on the ticket. Mr. Stewart inserted the number "R16134" over the numbers "2B61143" which the defendant had written.

Donn Mire, an examiner of questioned documents, examined and compared the handwriting which the defendant had made on page 47 of a record book; the writing on certain motel receipts, some portions of which were written by the defendant; the handwriting found on the Union Oil sales slips found in the defendant's car, which he stated that he had written; and the writing appearing on the credit card delivery ticket for the United States Royal Master tires and tubes purchased from the aforesaid Stewart Service Station. He formed the opinion that the printing on the record book, the printing on the motel receipts, and the writing on the sales slips, were made by the same person who printed the body of the credit card delivery ticket for the tires and tubes from the Stewart Service Station, consisting of the name "Joseph H. Ronan," the license number, date, "4 U.S. Royal Master," the price, "Excise tax" and "4 tubes."

As his first ground for reversal of the order denying his motion for a new trial, appellant earnestly insists that while evidence of other transactions is admissible for the purpose of establishing intent, it was inadmissible and prejudicially erroneous in the case at bar since in the middle of the trial appellant conceded that intent had been proved and established. He contends that the only issue then remaining was

his defense that he had voluntarily abandoned the attempt charged against him and that as to that issue evidence of the other similar transactions was inadmissible.

It is true, as contended by appellant, that a long and unbroken line of decisions in this state establishes as a cardinal and universally recognized rule that in a criminal prosecution an accused can be tried only for the offense charged against him in the indictment or information, and that evidence of collateral, independent crimes is not admissible. But, there are equally well recognized and clearly defined exceptions to this rule. ██ ''Evidence of other crimes may be admitted when it tends directly to establish the crime charged by proving a material fact, where it is part of the res gestae, or where it helps to disclose motive, intent, premeditation, guilty knowledge, malice, or a common plan or scheme (20 Am.Jur., § 310 et seq., p. 289 et seq.; 22 C.J.S., § 683 et seq., p. 1089 et seq.; Wigmore on Evidence, vol. II, ch. XIII, p. 191 et seq.; Wharton's Criminal Evidence, § 345 et seq., p. 487 et seq.; 8 Cal.Jur., § 168 et seq., p. 60 et seq.; 13 Cal.Jur., § 84 et seq., p. 703 et seq.)'' (*People* v. *Albertson*, 23 Cal.2d 550, 576, 577 [145 P.2d 7].)

We are persuaded that in the case now engaging our attention the evidence was admissible because it disclosed both intent and a common plan or scheme.

A mere reading of defendant's testimony immediately suggests that he did not unequivocally concede that he intended to commit grand theft when he engaged in the actions charged against him. True, his counsel stated that it was conceded appellant ''intended to use that card at the time he went in that station. . . . The issue here is what his intention was at the time of his return,'' but, as pointed out by respondent, ''. . . such is not an admission that the appellant had the intent to defraud, by false or fraudulent representation, the Firestone Store of the wheels. He had admitted that he intended to use the credit card to obtain the wire wheels on credit, but he asserted that he had been authorized to do so by the man who gave it to him, whom he believed to be Joseph Ronan, whose name was on the card. If his story was true, we submit that he would have had no intent to defraud, because he believed that his actions had been authorized by 'Ronan,' who would pay the Firestone Store for the wheels. At no time did the appellant waver from his position that his intentions were completely innocent ones, designed to secure repayment of money owed to him by 'Ronan' in

a manner authorized by 'Ronan.' He admitted *no* felonious intent to defraud the store. His attorney's statement that he had admitted such an intent by using the credit card was not supported by the appellant's testimony.''

The prosecution had the right in the light of appellant's testimony to challenge his statement that his actions on the day here in question were not, as he contended, innocent and authorized, but on the contrary were unlawful and criminal, by showing a common scheme, plan and design. The evidence complained of herein tends to establish such a common scheme or plan and in the light of appellant's testimony, was admissible as tending to show that the crime of which he here stands convicted was committed by him as a part of his scheme or plan (*People* v. *Peete,* 28 Cal.2d 306, 314-319 [169 P.2d 924]; *People* v. *Westek,* 31 Cal.2d 469, 480, 481 [190 P.2d 9]; *People* v. *Deysher,* 2 Cal.2d 141, 149 [40 P.2d 259]; *People* v. *Craig,* 111 Cal. 460, 468, 469 [44 P. 186]; *People* v. *Hickok,* 56 Cal.App. 13, 18 [204 P. 555]).

We are also impressed that the evidence of other transactions was admissible on the question of appellant's affirmative defense that he had freely and voluntarily abandoned a criminal intent. ▮ Abandonment is a defense if the attempt to commit a crime is freely and voluntarily abandoned before the act is put in process of final execution and *where there is no outside cause* prompting such abandonment (1 Wharton Crim. Law, § 226, pp. 305-308; 14 Cal.Jur.2d 221). In the case at bar appellant testified that he ordered the wire wheels intending to charge them to ''Ronan's'' credit card as the supposed ''Ronan'' had authorized. He testified that after he ordered the wheels and presented the credit card, he began to be afraid that he would have to pay for the wheels himself, and that although he did not know the legal aspects of the transaction, he thought he might get in trouble for using the card. Thereupon he decided to stop the sale and save himself the money, and if he couldn't stop it, he would pay cash. He thought that if he didn't have the credit card with him he could not charge them, so he left it in a telephone book so that he couldn't charge the wheels. When he entered the station he did not have the card with him.

Appellant contends that the foregoing testimony given by him shows that he had voluntarily abandoned his plan to obtain the wheels on credit of the ''Ronan'' card and put the means of committing any offense entirely beyond his reach, thereby terminating the transaction before it amounted to an

attempt to commit grand theft. We are satisfied that the testimony presented to the trial court a factual question as to whether appellant's failure to complete a crime was such a free and voluntary act constituting abandonment or whether his conduct was because of fear of discovery of his unlawful acts or the appearance of the police at the service station. If the latter was true then there was no abandonment, as that term is known to the law. ▮ To challenge the evidence offered by appellant as to abandonment, the prosecution was justified in offering proof that he had theretofore secured merchandise by using credit cards not belonging to him, thereby supporting an inference that because of his past performances, it was unlikely that he would, in the instant case, freely and voluntarily abandon his plan after commission of a definite overt act (*People* v. *Walker,* 33 Cal.2d 250, 258 [201 P.2d 6] ; *People* v. *Corkery,* 134 Cal.App. 294, 297 [25 P.2d 257] ). ▮ If evidence of another crime or proof of similar acts is necessary or pertinent to the proof of the one charged, the law will not thwart justice by excluding that evidence simply because it involves the commission of another offense.

Also, the challenged evidence was admissible for the purpose of impeachment. On direct examination the appellant testified that he had received the credit card from ''Ronan'' about May 1st, and that he had never used it to secure any merchandise.

▮ In a criminal case it is proper to cross-examine an accused upon any relevant and material matter elicited on his direct examination, for the purpose of showing conduct or statements inconsistent with his direct testimony (Pen. Code, § 1323 ; *People* v. *Hoffman,* 199 Cal. 155, 161, 162 [248 P. 504] ; *People* v. *Peete,* 28 Cal.2d 306, 320 [169 P.2d 924] ; *People* v. *Westek, supra,* pp. 476-479). ▮ The evidence of other similar transactions was clearly within the scope of the direct examination of the appellant and therefore proper cross-examination to controvert appellant's direct testimony that he received the ''Ronan'' credit card about May 1st but had never secured merchandise upon it.

▮ Finally, appellant insists that the evidence is insufficient to establish an attempt to commit the crime charged ; that it shows no more than preparation to do so, and an abandonment of the project before any appreciable fragment of crime had been accomplished. In support of his claim, appellant asserts that ''the undisputed fact is that before

appellant came back to the Firestone Store he consciously and intentionally placed out of his reach the one indispensable instrument essential to 'commencement of the consummation.' "

While it is true that appellant left in a telephone book the credit card which he had originally presented to the service station manager, it cannot be said to be "indisputable" that he did so to deprive himself of the opportunity to consummate his previously initiated plan. As pointed out by respondent, it could, in view of the facts and circumstances shown in this case, be reasonably inferred that "appellant placed the card in the telephone book close by the store so that if, when he returned to the store he was apprehended by the police, he would be free of the incriminatory card which would have furnished evidence of his criminal activities; and that if, when he returned to the store he needed the card to secure delivery of the wheels he could excuse himself to go and get it, and then present it to get the delivery. Thus, it appears that the act of the appellant in putting the card in the telephone book did not necessarily indicate that he had abandoned his plan to secure the wheels by using it to obtain credit, or that he had put it out of his reach, as it could reasonably be inferred that his act was done to get the evidence of his criminal activity out of his possession until such time as it might be needed for the consummation of the crime. Further, there is no showing that the appellant would have had to present the credit card in order to get delivery of the wheels after his return to the store. As he had already presented the card and the name and number had been taken from it, it appears reasonable to infer that he would not have had to present it again, as the store had the pertinent information contained on it, and that he would have had only to sign for the receipt of the merchandise in order to get delivery."

It is true, as appellant insists, that preparation alone is not sufficient. ▉▉ The act, "must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation." (*People* v. *Miller*, 2 Cal.2d 527, 530 [42 P.2d 308, 98 A.L.R. 913].) ▉▉ Preparation is the devising or arranging the means or measures necessary for the commission of the offense. The attempt is the direct movement toward the commission after the preparations are made, and must be manifested by acts which would end in the consummation of the particular offense unless

frustrated by extraneous circumstances. ▊▊▊ And, once the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt (*People* v. *Anderson,* 1 Cal.2d 687, 690 [37 P.2d 67]).

▊▊▊ In the instant case it could reasonably be inferred that the appellant, when he returned to the store, first approached it with his brief case, and, perhaps, because he saw the officers at the store and his car without the new wheels, he became apprehensive that his criminal act had been discovered and in an effort to rid himself of the evidence thereof, he placed his brief case on the sidewalk, went back to the cocktail lounge and hid the card, and then returned to the station with the explanation that he intended to pay cash for the wheels. This would not be a voluntary abandonment, but rather an abandonment because of the appearance of the police, which would not constitute a termination of the criminal act sufficient to save the appellant from criminal liability for his attempt. (See *People* v. *Walker, supra,* p. 258.)

Furthermore, the conduct of appellant did not necessarily amount to an abandonment because he left the card in a place to which he could have returned and obtained it had the fear of apprehension proved groundless, and had it then become necessary to have the card in order to obtain the credit authorized by it. In view of the authorities we cannot agree with appellant in the conclusion that the evidence fails to disclose any overt act reasonably directed toward the consummation of the intended grand theft.

The order denying defendant's motion for a new trial is affirmed.

Doran, J., and Drapeau, J., concurred.