[Crim. No. 7157. Second Dist., Div. Three. Jan. 10, 1961.]

THE PEOPLE, Respondent, v. GARVEY FRANK FULTON et al., Appellants.

Earl C. Broady for Appellants.

Stanley Mosk, Attorney General, and Clara E. Kauffman, Deputy Attorney General, for Respondent.

FORD, J.—The information herein contained two counts. In each count, the defendants were charged with attempted grand theft, a felony. It was alleged in the first count that the person whose money they attempted to obtain was Clyde Fisher. In the second count, the name of the intended victim was stated to be Hugh L. Powers. Having been found guilty as to each count in a trial in which each defendant waived his right to trial by jury and having been sentenced to the state prison for the term prescribed by law, each defendant has appealed from the judgment against him.

Pursuant to a stipulation, the case of the People was submitted upon the transcript of the testimony given at the preliminary examination and the exhibits there received. Neither defendant testified. The contentions on this appeal are that, with respect to each count, the evidence was insufficient to establish the requisite specific intent and that the evidence was insufficient to show that the acts of the appellants constituted an attempt to commit grand theft as distinguished from mere preparation. It is, therefore, necessary to summarize the evidence.

Clyde Fisher testified that on April 24, 1959, during the noon hour, the appellant Fulton approached him near where he was working as a painter and asked him as to the location

of the Watson Hotel. The witness stated that he knew of no such hotel. Fulton said that he was from Jamaica and had arrived at San Pedro on a ship which would be in port for 21 days. He further said that he had met a girl in San Pedro, had bought her a few drinks and given her $50, and she had promised to meet him at the Watson Hotel in Long Beach. Fulton told the witness that he had $1,000 in his pocket and $3,000 "around his belt." He "pulled out a wad of bills that looked about that big" and exhibited it briefly. Fulton said that his captain, who was from Stalingrad, had advised him "to be awful careful around here." The witness told Fulton he should put the money in a bank because otherwise someone might kill him to get it. Fulton replied that his captain had told him that the rich people did not allow the poor people to have any money here. In response, the witness said he had money in the bank which he could withdraw whenever he wanted to do so.

During the course of the conversation, the appellant Perkins, who appeared to be lame, came upon the scene and was asked by Fulton about the Watson Hotel, the story of the girl in San Pedro being repeated. Perkins replied that there was no such hotel and that Fulton had "been taken." Fulton also told Perkins of his money. Perkins suggested that Fulton stay at the Y.M.C.A.; the latter offered Perkins money if he would drive him there. Perkins said he was a preacher's son. All three got into the automobile which happened to be just across the street. Fulton told the witness he would give him $300 if he could prove to him that, if a man put money in a bank in America, he could withdraw it. As they drove along, Fulton said, "I will raise that to $500 if you will show me you can get your money out of the bank." Fulton said that if he could, then the witness could put his money back in the bank and that he would also deposit his money. So they went to the witness' place of residence and obtained his bank book. On the way there, Fulton threw the "thousand dollar roll" to Perkins, saying, "Here, you keep this thousand. If he shows me this money is O. K. and he can get it out of the bank and stuff, you give him $500 out of that roll." They drove to the vicinity of the bank. Perkins pretended to take a $50 bill from the roll so that he could see if it was counterfeit and then gave the roll back to Fulton. Perkins then told Fulton to get up so he could search him to see if he had any guns. He searched him and then told the witness, "I think we are safe." Fulton refused to go in the bank with the witness and Perkins, saying

that he might receive "a kick in the rear" if he went in and he was afraid. The witness asked the teller for $6,000. This was through a mistake on his part, since his bank balance was $5,621. He discussed with the teller the matter of the loss of interest upon such a withdrawal. Finally, the teller left and went over to a vice president, who called the witness into his office. After discussing the matter with the vice president, whom the witness had known for some time, he was told that it was "a bunco game."

In the meantime, Perkins had a bill changed and then sat down in the bank. The bank officer called the police. The police gave the witness two envelopes and told him to return to the automobile. When the witness returned to the place where it had been parked, it was gone. However, he stood there and soon Perkins and Fulton came down the street in the automobile. The witness then testified: "Both of them was in the car at that time and they stopped and they looked at me. . . . I hesitated and stood there and then they . . . started up and just then the police closed in on them. . . ." They were arrested. The officers found "this wad of bogus money" and a paper sack which appeared to be full of money.

A teller testified that on the particular day she saw Perkins standing behind Mr. Fisher at another teller's window. She asked him if she might help him. Perkins said she could and asked for four five-dollar bills in exchange for a $20 bill. Thereafter she saw him sitting on a chair in the lounge.

Hugh Leslie Powers testified with respect to the second count. On April 23 (the day before the Fisher incident), the appellant Perkins approached him as he was walking around the corner of Sixth and Walnut. Perkins, who was lame, beckoned to him and showed him a little piece of paper on which was written "Mary Brown" and the name of a hotel. The witness told Perkins that he knew of no such hotel. Perkins said that Mary Brown had met him as he arrived in San Pedro on a boat; he had given her $50. The witness testified that Perkins then "flashed this roll of dough." Perkins said he had never been in this country before. He was from Martinique and had been aboard a ship which had come from behind the Iron Curtain. He "tried to" speak with an accent. His ship was to be in port for three weeks. Perkins informed the witness that he had $3,500 in a money belt.

Appellant Fulton then appeared on the scene. During the course of the ensuing conversation, Fulton said that he was a Baptist minister's son and had lived in Long Beach for 20

years. At first, the witness thought that Fulton was a boy who formerly took care of his lawn. The witness told Fulton that he should take Perkins to the Y.M.C.A. "or somewhere" and obtain a room for him so that he would not be robbed. Fulton said that he did not want to become involved in it and that he had worked for Mr. Russell "up the street there" for a number of years. Perkins wanted to give the witness $50 "to help him get squared around." The witness said he did not want his money and suggested to Perkins that he put his money in a bank. Perkins said he was afraid of a "money house" because his captain had told him that, if you put your money in there, you could not withdraw it. The witness said that that was ridiculous and he would take him to his bank so that Perkins could deposit his money where it would be safe from theft. Perkins asked him if he had a "money book." The witness answered that he had, but Perkins did not believe him. So the witness said that he would get his bank book and go to the bank with Perkins to "draw out a little money to show you that I can draw the money out." The witness went upstairs to get his bank book; he had over $800 in that bank. However, he was suspicious and so he left his wallet, ring and watch in his home when he returned to the street where Fulton and Perkins were waiting.

Fulton happened to have an automobile which was parked in front of the witness' apartment. But instead of going to the location of the bank, Fulton stopped at another place near the bank; the appellants wanted the witness to explain "this story" again. They both looked at his bank book and wanted to know if that was all the money he had. Perkins said that he would not go into the bank with the witness because they would "kick him out." Fulton said he would go in, but the witness said there was no use of that. The witness stated that he would not go in the bank and get the money to show them. Finally, after Fulton said that Mr. Russell would take care of the matter and make $300, they took the witness home. As he got out of the car, Perkins said to him, "Well, you people have no money, you didn't have no money down there."

On cross-examination, Mr. Powers stated that as he left the house his wife remonstrated with him but he told her he would not "get taken for anything." He testified that he intended to take Perkins into the bank and write a counter check for $100 to show him that he could get some money out of the bank. His account was a savings account. One of the appel-

lants said, "You can't get $800 out of there." On redirect examination, the witness said, "I told him I wouldn't walk out of the bank with any money at all." He intended to take money out to show Perkins and then redeposit it. He said that he would not accept any money from Perkins.

Joe W. Morrill, a police officer for the city of Long Beach, testified as to the arrest of the appellants. In a pocket of Fulton's trousers was found a roll of bills. Fulton said that he was a gambler and used the bills to impress people with whom he was shooting craps. Concerning a bag which contained torn newspaper, Fulton said that they were going to have a barbeque and the paper was to be used to start the fire. With respect to Mr. Fisher, Fulton said that he told Fisher he was a gambler and Fisher said he was a "pretty sharp crapshooter, too"; they were going to shoot craps. The man was to draw some money from the bank in order to gamble with him.

 In considering the contentions of the defendants on this appeal, we are bound by the rule that this court cannot reweigh the evidence. (*People* v. *Carnavacci*, 119 Cal.App.2d 14, 16 [258 P.2d 1127].) As stated in *People* v. *Johnson*, 136 Cal.App.2d 665, at page 671 [289 P.2d 90] : "On appeal, the court is bound by the findings of the trial court, if there is substantial evidence, contradicted or uncontradicted, to support the conclusion arrived at in the court below."

 "In order to establish an attempt, it must appear that the defendant had a specific intent to commit a crime and did a direct, unequivocal act toward that end; preparation alone is not enough, and some appreciable fragment of the crime must have been accomplished." (*People* v. *Gallardo*, 41 Cal. 2d 57, at 66 [257 P.2d 29] ; see *People* v. *Camodeca*, 52 Cal.2d 142, 145 [338 P.2d 903] ; *People* v. *Buffum*, 40 Cal.2d 709, 718 [256 P.2d 317] ; *People* v. *Miller*, 2 Cal.2d 527, 530 [42 P.2d 308, 98 A.L.R. 913] ; *People* v. *Anderson*, 1 Cal.2d 687, 689 [37 P.2d 67].) As stated in the Anderson case, at page 690 : "There is, of course, a difference between the preparation antecedent to the commission of an offense and the actual attempt to commit it. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense. The attempt is the direct movement toward the commission after preparations are made and must be manifested by acts which would end in the consummation of the particular offense unless frustrated by extraneous circumstances."

The requisite intent is rarely susceptible of direct proof and ordinarily must be inferred from a consideration of all the facts and circumstances shown by the evidence. If the evidence is sufficient to justify a reasonable inference that such intent existed, a finding thereof by the trier of fact cannot be disturbed on appeal. (*People* v. *Lyles*, 156 Cal.App. 2d 482, 486 [319 P.2d 745]; *People* v. *Neal*, 97 Cal.App.2d 668, 672 [218 P.2d 556]; see *People* v. *Maciel*, 71 Cal.App. 213, 218 [234 P. 877].) In the present case, the conduct of the defendants warranted a finding by the trial judge, as the trier of fact, that the defendants had the specific intent to obtain the money of each of the prosecuting witnesses through trick and device. This is particularly clear from the evidence that in each instance the defendants made use of the same device in their efforts to get possession of money. In *People* v. *Darnell*, 97 Cal.App.2d 630 [218 P.2d 172], a case involving a scheme strikingly similar to that pursued in the case now before the court, it was said, at pages 634-635: ''Evidence of other acts of a similar nature may be admitted, when not too remote, to prove a material fact or where they tend to show motive, scheme, plan or system. (*People* v. *Henderson*, 79 Cal.App.2d 94, 119 [179 P.2d 406]; *People* v. *Poo On*, 49 Cal.App. 219, 223 [192 P. 1090]; *People* v. *Bernstein*, 88 Cal. App.2d 522, 525 [199 P.2d 22].) Such similar acts may be either before or after the perpetration of the crime charged. (*People* v. *Weir*, 30 Cal.App. 766, 767 [159 P. 442]; *People* v. *Talbot*, 220 Cal. 3, 17, 18 [28 P.2d 1057].) In the instant case, the evidence of acts of a similar nature shows a continuous practice of the same nature after the acts on which the convictions resulted and had a definite bearing on the intent of the defendants, as well as showing that they had a definite plan or system.'' (See also *People* v. *Von Hecht*, 133 Cal.App. 2d 25, 36 [283 P.2d 764]; *People* v. *Anderson*, 95 Cal.App. 225, 228 [272 P. 755]; *People* v. *Heinrich*, 65 Cal.App. 510, 515 [224 P. 466].)

Had the scheme of Fulton and Perkins succeeded in each instance, the crime of larceny by trick and device, which is embodied in the offense of grand theft as defined in section 484 of the Penal Code, would have been committed. (*People* v. *Johnson, supra*, 136 Cal.App.2d 665; *People* v. *Post*, 76 Cal. App.2d 511, 514 [173 P.2d 48]; *People* v. *Gatlin*, 75 Cal.App. 2d 288, 291 [170 P.2d 1013].) The confidence game described in the Johnson case involved the use of ''a man with a Jamaican accent'' and was of the same species as that in the

present case. There is no difficulty in reaching the conclusion that with respect to the first count, which involved the Fisher transaction, the acts of the defendants went further than mere preparation and constituted an attempt to commit grand theft. The persuasion of the defendants was sufficient to induce Fisher to obtain his bank book, enter the bank, and seek withdrawal of his money. It was a reasonable inference that only the intervention of the teller and the vice president of the bank, who called the police, interrupted the next step in the process, namely, the obtaining of possession of Fisher's money by the deceptive use of the paper bag which, it could reasonably be inferred, had been prepared for that purpose. (*Cf. People* v. *Johnson, supra,* 136 Cal.App.2d 665, 668-669.) The conduct on the part of the defendants was unequivocal action taken toward the commission of the crime and was clearly sufficient to sustain the conviction of attempted grand theft.[1] (See *People* v. *Camodeca, supra,* 52 Cal.2d 142, 145; *People* v. *Mann,* 113 Cal. 76, 79 [45 P. 182]; *People* v. *Wallace,* 78 Cal.App.2d 726, 742 [178 P.2d 771]; *People* v. *Paluma,* 18 Cal.App. 131, 135 [122 P. 431]; *People* v. *Arberry,* 13 Cal. App. 749, 757 [114 P. 411].)

The evidence with respect to the Powers transaction, which formed the basis of the second count, was not as strong as that with respect to the first count inasmuch as the defendants were unable to induce Powers to enter the bank on their terms. But it was a reasonable inference that their scheme failed of consummation because of the resistance

[1]In *Williams* v. *State,* 209 Miss. 902 [48 So.2d 598], a conviction of attempted larceny was affirmed in a case where the defendant tried to induce a bank depositor to withdraw money in $1.00 bills so that a division could be made of money in a pocketbook which the appellant claimed she had found. A particular dress shop was designated as the place for the division. The depositor started toward the bank but, instead of going into the bank, informed a police officer that the appellant and a confederate were ''trying to pull a 'pigeon dropping' game on her.'' The appellant and her associate were arrested at the dress shop. The court said (48 So.2d, at page 600): ''It is obvious that appellant and her companion designed and intended to obtain fraudulently the money of the Jacksons and convert it to their own use. The acts done in furtherance of that design were not merely slight, but were, in fact, substantial. The appellant and her companion ascertained that the Jacksons had money. They represented that a pocketbook had been found containing $105. The pocketbook and money were exhibited. The Jacksons had money in the bank. The scheme was to get $100 of their money by permitting Tillie to share in the proceeds of the pocketbook. The place for the division was designated. Tillie left the scene ostensibly to get the money. At the designated place, the appellant and her companion appeared to be nervous and sought to escape. The only thing lacking in the consummation of the larceny was the actual delivery of the money.''

of Powers rather than because of the will of the defendants. In fact, their efforts to persuade him to cooperate with their scheme continued until they departed after having driven him home. ▮ As stated in *People* v. *Hickman,* 31 Cal. App.2d 4, at page 12 [87 P.2d 80] : "If there is an intent to commit the crime, and an overt act is accomplished, the result may be ineffectual because of an obstruction physically or mentally on the part of the intended victim, but the crime of attempt is complete if the bar to the fulfillment of the object is unknown to the perpetrator at the time the overt act is performed." (See also *People* v. *Siu,* 126 Cal.App.2d 41, 44 [271 P.2d 575] ; *People* v. *Von Hecht, supra,* 133 Cal.App. 2d 25, 36 ; *People* v. *Carter,* 73 Cal.App. 495, 500 [238 P. 1059] ; Sayre, *Criminal Attempts,* 41 Harv.L.Rev. 821, 847 ; Perkins, *Criminal Attempt and Related Problems,* 2 U.C.L.A. L.Rev. 319, 354.)

▮ We turn, then, directly to the question of the sufficiency of the evidence under the second count to show acts beyond the stage of mere preparation. ▮ Inherent in the crime of larceny by trick and device is the employment of fraud and trickery in the obtaining of possession of property by one who has a preconceived design to appropriate such property to his own use. (See *People* v. *Bartges,* 126 Cal.App.2d 763, 770 [273 P.2d 49] ; *People* v. *McCabe,* 60 Cal.App.2d 492, 496 [141 P.2d 54] ; *People* v. *Sing,* 42 Cal. App. 385, 391 [183 P. 865].) ▮ The fraudulent statements and representations made by the defendants to Powers constituted the device used by them to further their confidence game. (See *People* v. *Lafka,* 174 Cal.App.2d 312, 314-315 [344 P.2d 619] ; *cf. People* v. *Johnson, supra,* 136 Cal.App.2d 665 ; *People* v. *Darnell, supra,* 97 Cal.App.2d 630.) Unlike the situation in *People* v. *Buffum, supra,* 40 Cal.2d 709, where each act done formed no part of the particular offense but was merely preparatory in nature rather than a direct, unequivocal act done toward the commission of the offense, in the present case the acts directed toward Powers formed part of the essence of the intended crime and constituted an appreciable fragment thereof. As stated in *People* v. *Von Hecht, supra,* 133 Cal.App.2d 25, at pages 38-39 : "Preparation is the devising or arranging the means or measures necessary for the commission of the offense. The attempt is the direct movement toward the commission after the preparations are made, and must be manifested by acts

which would end in the consummation of the particular offense unless frustrated by extraneous circumstances. And, once the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt (*People* v. *Anderson,* 1 Cal.2d 687, 690 [37 P.2d 67])." An overt act need not be the ultimate step toward the consummation of the design; it is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made. (*People* v. *Gibson,* 94 Cal. App.2d 468, 470 [210 P.2d 747]; *People* v. *Parrish,* 87 Cal. App.2d 853, 856 [197 P.2d 804]; 1 Wharton, Criminal Law and Procedure (1957 ed.), § 74.) Certainly, the defendants had taken substantial steps beyond mere preparation toward the accomplishment of their purpose and, as the evidence shows, were thwarted only because their intended victim displayed unexpected stubbornness after he had obtained his bank book and had started to the bank in a vehicle conveniently provided by the defendants. The evidence was sufficient to support the conviction under the second count.

The conclusions which have been stated herein are not affected by a further contention of the defendants which remains for discussion. Upon direct examination when called as a witness for the prosecution, Officer Morrill related a conversation which he had had with the defendant. Fulton said that he carried rolls of paper that appeared to be money for the purpose of impressing people with whom he gambled. Fulton further told the officer that he had informed Fisher that he was a gambler and Fisher had said that he was "a pretty sharp crapshooter, too." They were going to gamble. On cross-examination, the officer further testified that the defendant Fulton said that the man was to draw some money from the bank so that he might gamble with Fulton. The argument made is that such evidence offered by the prosecution as part of its case "established the lack of criminal purpose and intent of the defendants." Reliance is placed on *People* v. *Estrada,* 60 Cal.App. 477, a murder case, wherein it was said at pages 482-483 [213 P. 67]: "The proof on the part of the prosecution (referring now to the statement of the defendant) did, as we have indicated, show a case of justification, and there is nothing in any of the other evidence presented which in anywise tends to contradict or dispute defendant's version of the affair." But in the present case there was ample evidence produced by the prosecution which contradicted Fulton's version. Consequently, the

applicable reasoning is that found in *People* v. *Acosta*, 45 Cal.2d 538, at pages 542-543 [290 P.2d 1] : ". . . if there is prosecution evidence which tends to disprove criminality and other prosecution evidence which tends to prove criminality, it is the function of the trier of fact to determine which version is to be believed. [Citations.] ▇▇▇ The courts may sometimes say that the prosecution is 'bound by' extrajudicial statements of defendant which are introduced by the prosecution and which are irreconcilable with guilt, but this concept is applicable only where there is no other competent and substantial evidence which could establish guilt.'' (See also *People* v. *Scorza*, 172 Cal.App.2d 571, 573 [342 P.2d 295].)

As to each defendant, the judgment is affirmed.

Shinn, P. J., concurred.

VALLÉE, J.—I concur in the judgment as to count I. I dissent as to count II. In my opinion the statements of defendants in respect to count II amounted to nothing more than preparation—arranging the means or measures necessary for the commission of the offense. They did not amount to an attempt—a direct movement toward commission of the offense after the preparations have been made. (*People* v. *Franquelin*, 109 Cal.App.2d 777, 784 [241 P.2d 651].) ''The act, 'must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation.' (*People* v. *Miller*, 2 Cal.2d 527, 530 [42 P.2d 308, 98 A.L.R. 913].)'' (*People* v. *Von Hecht*, 133 Cal.App.2d 25, 38 [283 P.2d 764].) The acts of defendants did not amount to direct unequivocal acts which would lead to culmination of the offenses unless interrupted by circumstances independent of any actions on their part. (*People* v. *Buffum*, 40 Cal.2d 709, 718 [256 P.2d 317].) I would reverse the judgment as to count II.

Appellants' petition for a hearing by the Supreme Court was denied March 8, 1961.