[Crim. No. 13081. Second Dist., Div. Four. Apr. 16, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES ORNDORFF, Defendant and Appellant.

Florence G. Mills, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Howard J. Bechefsky and Bruce Perlman, Deputy Attorneys General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged with attempted grand theft. The case was submitted on the transcript of the preliminary examination, together with testimony by defendant. He was found guilty as charged, probation was denied and he was sentenced to state prison. He has appealed. We reverse the judgment.

The victim, Juniper Griffis, testified that he was accosted on a street in Long Beach by a Negro sailor, who asked him concerning a hotel. In the conversation that followed, the sailor displayed a roll of bills and told Griffis that he had been given it by his ship's captain as the proceeds of insurance on the life of the sailor's brother. Griffis advised the sailor to put the money (allegedly $19,000) in a bank but the sailor demurred, saying that he understood that if a Negro deposited money in a bank, the bank would not let him withdraw it. At this stage, defendant appeared, walked by the two men and was accosted by Griffis, who asked defendant to help "straighten out" the sailor. After further conversation, the three men drove, in defendant's car, to Griffis' home to procure his bank book so that Griffis, by making a withdrawal from his account, could satisfy the sailor that the sailor could safely make a deposit. They then drove to the vicinity of Griffis' bank. The sailor remained in the car, Griffis and defendant walked toward the bank but, before reaching it, defendant stopped, telling Griffis to go to the bank alone, as defendant wanted to watch the sailor. Griffis went to the bank where he met his wife; after Griffis and his wife talked to the assistant manager they left the bank to find that defendant, the sailor and the car had disappeared.

Thereafter police officers went to defendant's home, advised him of his constitutional rights,[1] secured permission to search

---

[1] The warning satisfied the requirements of *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; since the trial began in April 1966, no more was required. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

the apartment, discovered a roll of "play money" and arrested defendant. The roll of play money was introduced into evidence. During conversations that took place, then and later, defendant admitted his participation in the affair, but claimed that he recognized that the sailor was attempting a scheme known as the "Jamaica Switch," did not want to get involved because he was on parole, and dropped out of the proceedings as he and Griffis approached the bank.

A police officer, properly qualified as an expert on "bunco" schemes, described the so-called "Jamaica Switch," as follows:

"A. The No. 1 Negro I will refer to as the sailor, stops an elderly white man and gives a conversation similar or in scale to what Mr. Griffin [*sic*] described, in which he will talk about how he is a poor old Negro. He says he is from Jamaica or Martinique or one of the islands down there. He has been left this amount of money, that the captain keeps the money and he is interested in keeping the money in the captain's safe; the night before the girl had tried to take him, getting the victim's sympathy. He then talks about the girl and the hotel, bringing in the sex angle. The third subject will come along, the No. 2 Negro comes by, a man that looks prosperous, has a fine fitting suit, probably wearing a hat and as Mr. Griffis stated, the sailor will constantly refer to himself as a nigger.

". . . . . . . . . . . . .

"A. Yes sir. There is a discussion about finding a hotel, they then go around and get the victim's bank book. Usually a roll of 100 and 500 dollars is shown to the victim by the sailor, after showing him that he can get his money in and out of the bank. They will take the victim to the bank, he gets his money out and shows it to the sailor. The sailor will then grab the money and get the victim's money in his hand and tell the victim what a wonderful man he is, and he will have a handkerchief or a bag or a container he can put the money in. So he will take the victim's money, put it in the handkerchief and tell him what a wonderful man he is. He also will take the award money and put the money in the sack and hand it back to the victim. At that time the victim has his own money and then the money the suspect had carried. The victim will start to put it into his pocket, coat pocket, inside pocket or even in his hand. The sailor grabs the package back and says, 'Oh no, man, like my momma used to tell me,' and he will open the victim's shirt and put the package back into there in

between the flesh and the shirt, then button it back up. As he grabs the shirt, the No. 2 suspect will turn the victim's attention by saying something to him just after the sailor has taken the money back. At that time the switch is made and the package is inserted and when the victim gets back to deposit his money he finds he has newspapers or worthless articles and his money has gone south with the sailor.''

 It is the prosecution's theory that defendant and the sailor (who is not involved in the present case) attempted to practice a Jamaica Switch on Griffis but were prevented from success. On appeal, defendant urges, among other contentions,[2] that the evidence shows, at the most, mere preparation not going far enough to constitute an attempt. Since we agree with that contention, it is not necessary to discuss the objections made in the trial court and here to the introduction of certain evidence.

Both parties cite and rely on *People* v. *Fulton* (1961) 188 Cal.App.2d 105 [10 Cal.Rptr. 319]. We conclude that that case supports the defendant rather than the prosecution. *Fulton* also involved an alleged Jamaica Switch, practiced on two alleged intended victims. The schemes failed, in one instance because a bank officer told the intended victim that it was a bunco scheme, in the other because the intended victim became suspicious and refused to enter his bank and make the proposed withdrawal. In *Fulton,* the court unanimously held that the first instance was a punishable attempt; by a divided court, the second instance was also held to have reached the status of attempt. All three judges lay stress on the element of the procuring cause of failure, saying that it must be ''by extraneous circumstances,'' or ''by circumstances independent of any actions of their [defendants'] part.'' But while, in *Fulton,* the schemes failed because the victim withdrew, here the only evidence is that it failed because defendant abandoned the scheme before it reached the first significant step. It is, of course, possible that Griffis' wife and the bank manager had (as in the first count in *Fulton*) warned Griffis that he was involved in a classic bunco scheme and that he had abandoned the scheme. But there is no evidence to that effect. We do not know what either the wife or the bank officer told Griffis or what he told them. The Attorney General sug-

---

[2]It is also argued: (1) that the evidence, apart from defendant's statements, shows no corpus delicti; (2) that the entry into defendant's apartment and its search were illegal, and (3) that there was inadequate representation by counsel.

gests that "inferably" defendant had seen Mrs. Griffis at the bank and had been frightened off by that fact; but there is no evidence that he saw her or knew that she was to intervene in the events.

Looking at the expert's description of the classic scheme, it is to be noticed that not one, but many steps still remained to be performed: the victim must withdraw his money, deliver it to the thief, the thief must perform his sleight-of-hand "switch" of the victim's money for the substitute play money or newspaper, and the thief must leave the scene before the victim opens the substituted package. None of these had taken place. Only the first two steps had been accomplished: the victim had procured his bank book and had gone to his bank. Too many potential slips remained before the cup of success would reach the defendant's lip for us to say that there was here anything more than preparation.

The judgment is reversed.

Files, P. J., and Jefferson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 11, 1968.