STATE of Missouri, Respondent,

v.

Jimmy Dale PURVIS, Appellant.

No. KCD 27364.

Missouri Court of Appeals,
Kansas City District.

July 7, 1975.

---

**3.** As previously noted, Pellom acknowledged receipt of payment of $1,000 toward his fee.

William G. Mays, II, Public Defender, Columbia, for appellant.

John C. Danforth, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special JJ.

SWOFFORD, Presiding Judge.

Appellant was convicted by a jury of the crime of arson under Section 560.025 RSMo 1969, V.A.M.S. He was tried under the Second Offender Act and was sentenced by the court below to three years imprisonment.

On July 14, 1973, at approximately 2:30 a. m., firemen responded to the scene of a burning fraternity house in Columbia, Missouri. The building was unoccupied at the time, and the origin of the fire was determined to have been in a smoldering mattress in a bedroom on the east side of the second floor and not to be the product of natural causes. At this time, the appellant (hereinafter referred to as "defendant") was on probation from a previous conviction of arson, upon a plea of guilty in the Circuit Court of Cooper County, Missouri and was voluntarily under the care of the Mid-Missouri Mental Health Center (hereinafter referred to as "Center").

On July 18, 1973, the defendant gave a written statement to one Carroll Highbarger, a police officer of Columbia assigned to the office of the prosecuting attorney of Boone County. In this document the defendant stated that on July 13, 1973, he had left the Center at about 8:00 p. m., walked to the fraternity house at 601 East Rollins, gained admittance through an unlocked rear door, and had set fire to some paper in a cardboard box, which box was resting on a mattress in a second floor bedroom on the east side of the house. The defendant recounted that after the contents of the box and the mattress were burning, he left the bedroom, went into the hallway, and started down the steps. He then decided that he "didn't really want the place to burn" and took a fire extinguisher from the wall, went back to bedroom and put out the fire. He then placed the extinguisher on the floor, left the premises, went back to the Center to his room, and stayed there the rest of the night.

A motion to suppress this confession was filed and an evidentiary hearing had thereon prior to trial. The trial court overruled the motion and the confession was admitted into evidence and read to the jury.

■ The first point raised by defendant is a broadside charge that he was deprived of a fair trial by reason of the state's failure to comply with Section 320.230 RSMo 1969 (Laws 1972), relating to the performance of investigations by the State Fire Marshal of fires where arson is suspected.

This point has not been properly preserved for review since it does not conform to Rule 84.04(d), V.A.M.R., made applicable to criminal appeals by Rule 28.18, in that the point does not state "what actions or rulings of the court are sought to be reviewed" and "wherein and why they are claimed to be erroneous". *State v. Carr,* 499 S.W.2d 788, 790[3] (Mo.1973).

Such procedural deficiencies aside, however, it may be gleaned from the argument portion of defendant's brief that the thrust of his complaint is that the State Fire Marshal did in fact investigate the fire here involved in February of 1974, some six months after the event; did make a report, and that such report was inconclusive as to the cause of the fire. He asserts that it was the ethical duty of the state to furnish him a copy of this report, which he interprets as exculpatory and tending to negate the possibility of his guilt.

■ This argument loses all impact upon this appeal because the record is completely silent as to any such investigation or report, except the allegations contained in the defendant's unverified motion for a new trial. Therefore, by any process of reasoning, this argument distills into the proposition that the trial court erred and abused its discretion in overruling the defendant's motion for a new trial upon the ground of newly discovered evidence, i. e., the State Fire Marshal's purported investigation and report. Yet, as a part of or at the hearing on the motion for a new trial, the defendant offered no evidence of any kind in support of this allegation in his motion. "It is a clearly established rule that unverified allegations in a new trial motion do not prove themselves." *State v. Underwood,* 470 S.W.2d 485, 487[5] (Mo.1971); *State v. Lay,* 427 S.W.2d 394, 402[6] (Mo.1968).

■ Also contained in defendant's argument on his first point is the charge that the court erred in admitting the testimony of Joe Bryson, Battalion Chief of the Columbia, Missouri Fire Department, as to the cause of the fire here involved. The basis for this claimed error is that Bryson was not shown to be a qualified expert as contemplated by Section 320.230 RSMo 1969 (Laws, 1972). The record is clear that Bryson was, in fact, shown by experience and education to be a qualified expert, and his testimony was properly received. However, this point of alleged error is not properly presented for review in defendant's "Points Relied On", as required by Rule 84.04(d). Defendant's first point is ruled against him.

■ The defendant's second point is that the court erred "in failing to declare a mistrial upon defendant's objection to statements made by the state in closing argument". This point also fails to comply with the standards of Rule 84.04(d) and could be disregarded. However, it is wholly without merit.

■ The defense postulated by defendant was that of alibi. Through other witnesses (he did not testify), he sought to establish that he was physically present at the Center at the time the fire was set. He asserts that in closing argument the prosecuting attorney sought to place the burden upon him to prove his innocence. Of course, as a fixed and definite principle of criminal law, no burden rested upon the defendant to prove his innocence, and a jury argument permitted over proper objection to that effect would be reversible error, even though as a general rule the scope of permissible jury argument rests largely within the discretion of the trial court. *State v. Schlagel,* 490 S.W.2d 81, 85–86[5] (Mo.1973).

The exact portion of the prosecutor's argument toward which this point is aimed is not made clear in defendant's brief, either in his statement of facts or his argument under Point II. Since his point relates to the "state's *closing argument*" and relates to burden of proof, it is assumed that the following trial incident is the basis for this alleged error:

(The Prosecuting Attorney discussing the testimony of the alibi witnesses):

" * * * Even if you assume they're all exactly on the nose on their times, there are still times when Jimmy Purvis could have left (the Center) and there is no proof he didn't leave. The defense has produced absolutely no proof he did not leave—

MR. MAYS: (Defense counsel) The burden is not on the defendant.

THE COURT: *Sustained. Jury will disregard counsel's last comment.*" (Material in parenthesis and emphasis supplied)

■ It thus is clear that defense counsel's objection (if his statement above quoted is to be considered as an objection) was sustained and the jury was instructed to disregard the prosecutor's remarks. No request for further action or for a mistrial was made by defense counsel. Defendant received more relief from the trial court than he sought. Error does not appear and cannot be predicated upon this record. *State v. Woodard*, 499 S.W.2d 553, 559–560[13, 14] (Mo.App.1973); *State v. Baity*, 494 S.W.2d 425, 429[13, 14] (Mo.App.1973).

■ Defendant's third point on appeal attacks the admission of his confession on three separate grounds, A) the initial statement (oral) was illegally obtained and the subsequent statement (written) was tainted by it; B) the state failed to show that the defendant made a knowing and intelligent waiver of his constitutional rights; and C) the statements were not voluntarily made. Points B and C have not been preserved for review since neither was specified in defendant's motion for a new trial nor otherwise urged upon the trial court. To the contrary, during the arguments on the new trial motion, the transcript discloses the following colloquy:

"THE COURT: Mr. Mays (counsel for defendant), let me ask you this question, because this does basically involve a question of whether as a result of one statement which you contend was illegally—

you're making no contention the statement taken by Mr. Highbarger was improperly taken, are you?

MR. MAYS: No.

THE COURT: Your contention is that it is the fruit of the poisonous tree, is it not?

MR. MAYS: Yes, sir."

The defendant's position, therefore, is that his initial inculpatory statements to Valentine and Forlow were obtained illegally and, therefore, the subsequent formal confession to Highbarger was tainted thereby. The gist of his argument is that the locale of the initial interview and the presence of his probation officer, Forlow, made the interrogation "in-custodial", accusatory rather than investigatory in nature, and, therefore, required the giving of a *Miranda* warning. There is no dispute that such warning was not given at the initial meeting.

The resolution of this problem requires a brief summary of the facts and circumstances giving rise to defendant's claim.

At the time of these occurrences, as has been heretofore noted, the defendant was on probation from a former conviction of arson. His then probation officer was one Arthur Forlow. The defendant was a voluntary patient at the Center and had previously received treatment at Reality House in Columbia, a rehabilitative institution for probationers and parolees, supported in part by grants from the national government through the Law Enforcement Assistance Administration. While the evidence presents some conflict on this point, there was ample evidence from which the jury could conclude that the defendant was under little or no custodial restraint at the Center.

The fire here involved occurred on the night of July 14, 1973 or early morning of July 15, 1973. On July 16, 1973, one Becky Naderie, a counsellor at Reality House who had worked with the defendant, called Carroll Highbarger, the police officer connect-

ed with the prosecutor's office, and asked him if arson was being considered in connection with the fire and suggested that defendant might possibly have had some connection with it. She also discussed the matter with her coworkers, George Brown and William Valentine.

Valentine testified that a few days later, he contacted Arthur Forlow and that on July 18, 1973, he and Forlow went to the Center to see how the defendant was progressing. Dutton was a psychiatric social worker at the Center. Dutton told Valentine and Forlow that the defendant had mentioned the fire the evening of July 17, 1973. Valentine testified that he, Dutton and Forlow then talked to the defendant, who indicated to them that he had been involved in setting the fire. Valentine then asked the defendant if he wanted to talk to a police officer or someone from the prosecutor's office. The defendant stated he did so desire.

Forlow's version of this conversation was that the defendant told them he had set the fire and "wanted to get that off his chest". He stated that he was empowered as a probation officer to arrest the defendant, but that at no time did he place the defendant under arrest. He further stated that he did not go to the Center to check on a possible probation violation or to specifically talk about the fire; that he did not take an active role in the interviews; and that there was no intimidation or coercion employed by anyone.

After defendant's admission and expression of desire to talk to a police officer or other official, Valentine called Highbarger, who came to the Center within a few minutes. Another meeting then occurred. Present were Valentine, Forlow, Dutton, Highbarger, the defendant, and his attending physician, Dr. Richard Newman, M.D. Highbarger identified himself to the defendant as a police officer, gave him the full Miranda warning; the defendant stated he understood his rights; and then High-

barger interrogated him about the fire in the presence of the others above named. As a result, he wrote out a confession "as Jimmy (defendant) gave it to me", the defendant initialed each paragraph, and both defendant and Highbarger signed the last page. Highbarger then asked defendant if he would go to the site of the fire and show him what happened. The defendant agreed and he, Valentine and Highbarger went to the fraternity house where the Miranda warning was again given by Highbarger, and the defendant reenacted his activities with reference to the fire.

All of the witnesses, including Dr. Newman, testified there was no coercion or force exerted, or threats made, by anyone to compel the confession and later reenactment.

Defendant relies on Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and State v. Williams, 486 S.W.2d 468 (Mo.1972). In Williams, the defendant had been arrested by uniformed police officers, taken to the police station in the early morning, and interrogated by parole officers respecting the commission of a separate offense. A complete Miranda warning was not given, and the court held appellant was questioned (l.c. 473–474):

"in a police department atmosphere after having been deprived of his freedom as a parolee, and after the constructive custody on parole had been transformed into actual physical custody under circumstances involving the 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely,' thus requiring adequate, effective and full appraisal of his constitutional rights . . .."

The court below expressly distinguished Williams from the case at bar, and its conclusion was correct. There were none of the "inherently compelling pressures" undermining appellant's will to resist. From the evidence it may be concluded that ap-

pellant's statement was of the voluntary variety, i. e. he seemed most willing to get the matter "off his chest" and responded without apparent hesitation to what at most was a simple, straightforward inquiry. The record however, is not abundantly clear whether any specific inquiry was ever made at the initial interview or whether defendant's admission was entirely spontaneous. Thus, it seems that the circumstances which are likely attendant to custodial interrogation were not present, nor does it readily appear that appellant was indeed in "custody". He was certainly not formally in custody, and such a brief investigative encounter could not be characterized as in any way depriving him of his freedom of action or choice in any significant way.

Reference is also made by defendant to *State v. Evans,* 439 S.W.2d 170 (Mo.1969) wherein a suspect was questioned by a police officer while he was in the hospital. In holding that a custodial interrogation did take place, the court emphasized the existence of sufficient cause to arrest without a warrant, the accusatorial nature of one question, and the certain deprivation of freedom. None of these factors exist at bar.

■ This court's review of such questions is limited to whether there was sufficient evidence to support the lower court's ruling. *State v. Alewine,* 474 S.W.2d 848, 852 (Mo. 1971); and *State v. Stubenrauch,* 503 S.W.2d 136 (Mo.App.1973). Given the low-keyed and brief nature of the confrontation, plus the lack of anything but speculation as to guilt (prior to defendant's admission) as well as appellant's readiness to confess, the subsequent written confession was properly admitted into evidence.

■ Defendant's final point is the claim that the trial court erroneously failed to instruct the jury on the offense of attempted arson, Section 560.035 RSMo 1969. The trial court was not requested to so instruct the jury, but the defendant asserts that the

court was required to give this instruction, whether requested to do so or not, under Rule 20 and Rule 26.02(6). Nor does the point set out in defendant's brief offer any enlightenment as to why the instruction on attempted arson should have been given in this case, and hence also violated Rule 84.-04(d), *State v. Watson,* 511 S.W.2d 890, 892–893[4, 5] (Mo.App.1974). In any event, the point is without merit.

■ As heretofore discussed, the statement of the defendant, together with the testimony of the firemen as to the source of the fire, and the complete absence of any physical evidence of any cause thereof other than defendant's admitted arsonous activity, afforded substantial evidence for the jury to conclude (as it did) that the defendant was guilty of arson, Section 560.-025 RSMo 1969. In this state of the record, there was no room for an instruction on attempted arson. Section 556.160 RSMo 1969, first adopted in 1855 and remaining substantially unchanged, provides in pertinent part:

> *"When crime committed, punishment for an attempt cannot be inflicted* No person shall be convicted of * * * any * * * attempt to commit any offense, when it shall appear that the crime intended or the offense attempted was perpetrated by such person * * * in pursuance of such attempt."

This statute, so far as research discloses, first received the attention of the Supreme Court in *State v. White,* 35 Mo. 500 (1865) where the defendant was charged with rape and assault with intent to commit rape. The court said, l.c. 501:

> " * * * But, if full faith and credit are to be given to her (prosecutrix's) statement, then the act was fully consummated, and the jury were not warranted, under our statute, in convicting the defendant of an assault with intent to commit a rape."

Under the present statutes governing the crime of arson there are no degrees or grading of the felony. A person charged, if convicted, is either guilty of arson (Section 560.025 RSMo 1969) or of attempted arson (Section 560.035 RSMo 1969), and if evidence of arson is before it, the only choices open to a jury are conviction or acquittal for that offense.

The rule first enunciated in *State v. White, supra,* has remained unchanged in this state for 110 years. *State v. McCaffery,* 225 Mo. 617, 125 S.W. 468 (1910), arson; *State v. Gadwood,* 342 Mo. 466, 116 S.W.2d 42, 55–56[17–18] (Mo.1938), murder-felonious assault; *State v. Baker,* 276 S.W.2d 131, 134[4, 5] (Mo.1955), rape; *State v. Pigques,* 310 S.W.2d 942, 945[1] (Mo. 1958), burglary; *State v. Grant,* 394 S.W.2d 285, 289–290[10] (Mo.1965), rape; *State v. McDaris,* 411 S.W.2d 126, 127–128[1] (Mo. 1967), rape; and many other decisions.

The defendant seeks to avoid the application of this statutory and decisional principle by reference to that part of his confession in which he recounts the fact that after he had started the fire in the box on the mattress in the east bedroom on the second floor of the house, he experienced a change of heart and abandoned his criminal intent, "I thought that I needed to come back to the hospital and talk my anger out and *I didn't really want the place to burn.*" His confession then relates that he obtained the fire extinguisher and "went back to the room and *put the fire out.*" In this area, two things clearly emerge from the confession and the state's evidence.

First, defendant's original intent when he set the fire was that "the place" burn. Second, he did not, in fact, "put the fire out". At best, he may have delayed its action. The state's evidence showed that the fire was confined to the east second floor bedroom for a considerable period of time; was a very "hot" fire; burned through a double floor of hard wood, heavy supporting joists, plaster and lath, and

finally burst through into other parts of the house, causing extensive damage. While defendant "confessed" that after his change of heart he "put the fire out", the jury, under this record, could, and did, reject this premise. The weight to be given to this (or any) part of the confession was for the jury. The *corpus delicti* of the crime with which the defendant stands convicted was clearly established; the criminal act of setting the fire with the intent that "the place" burn, and the defendant's "agency in the production of that act." *State v. Celmars,* 399 S.W.2d 145, 147[1] (Mo.App.1966); *State v. Varnell,* 316 Mo. 169, 289 S.W. 844, 845[3] (1926).

The question remains as to what affect, if any, his change of heart and attempt to "undo" his crime has upon his responsibility for that crime.

The general rule is thus stated in 22 C.J.S. Criminal Law § 29, p. 99:

" * * * If, however, the requisite criminal intent exists at the time of the commission of the act, the crime is committed and a subsequent change of intent will not relieve the actor of responsibility, since he cannot abandon what he has already done. * * * "

A refined statement of this principle, applicable in this case, is found in 22 C.J.S. Criminal Law § 37, p. 127, where it is stated:

"One may be guilty of a crime where the prohibited act is committed through the agency of mechanical or chemical means, as by instruments, poison, or powder, and *where one puts in force an agency* for the commission of a crime, he, in contemplation of the law, *accompanies the agency to the point where it becomes effectual.*" (Emphasis supplied)

See also: Perkins on Criminal Law, 2nd Edition (1969), Chapter 6, Section 3–D, pp. 588–591; *Hackney v. Commonwealth,* 186 Va. 888, 45 S.E.2d 241, 242[2] (1947); *Beausoliel v. United States,* 71 App.D.C. 111, 107

F.2d 292, 297[17] (1939); Wharton's, Criminal Law and Procedure (1957), Vol. 1, Section 76, p. 161.

Of interest here is the ancient case of *State v. Hayes,* 78 Mo. 307 (1883) in which the defendant was convicted of attempted arson. The evidence showed, in substance, that he had arranged to have one McMahan set fire to certain premises which had been saturated with coal oil by defendant. All plans were made and McMahan was in position to commit the arson. All he lacked was a match, which defendant offered to supply. Defendant did not follow through with his part of the arrangement, but apparently abandoned the scheme, in that he disappeared (ostensibly to obtain the match) and did not return. The fire therefore did not occur, but the defendant was convicted of attempted arson. In affirming the conviction, the court recognized the doctrine of *locus poenitentiae* (place of repentance) and said, l.c. 317:

" * * * Anywhere between the conception of the intent and *the overt act toward its commission,* there is room for repentance; and the law in its beneficence extends the hand of forgiveness. *But when the evil intent is supplemented by the requisite act toward its commission,* the statutory offense is completed. 'A crime once committed may be pardoned, but it cannot be obliterated by repentance.' 1 Bishop Crim.Law, § 732. * * * " (Emphasis added)

The logic of this declaration is apparent and was succinctly stated in the case of *People v. Claborn,* 224 Cal.App.2d 38, 36 Cal.Rptr. 132 (1964). In that case, the defendant was charged with an assault with a dealdy weapon (an automobile), the claim being that he intentionally rammed a police vehicle with the automobile he was driving. The defendant argued that since he had laid down 21 feet of skid marks before impact, this demonstrated an abandonment of his criminal intent prior to the commission of the assault and operated as a defense to the

charge. In rejecting this theory, the court said (36 Cal.Rptr. l.c. 134):

" * * * Moreover, even though the skid marks did indicate a last moment change of intent * * * guilt for the consequences of the force defendant had set in motion was not thereby absolved. Abandonment of intent is only a defense if the attempt to commit the crime is freely and voluntarily abandoned *before* the act is put in the process of final execution. (*People v. Von Hecht,* 133 Cal.App.2d 25, 36, 283 P.2d 764.) As stated in 15 American Jurisprudence, section 333, pages 22–23: 'There is in every design or plan to commit a crime a place of repentance or *locus poenitentiae* whereby the one planning to commit it may abandon the idea and thus avoid criminal liability. * * * It is obvious, however, that where the crime is consummated, there is no field for an application of the doctrine.' (See also Miller on Criminal Law, p. 100.) * * * " (Emphasis the Claborn court's)

The court then quoted from 22 C.J.S. Criminal Law § 37, p. 127, *supra,* and concluded:

" * * * This language, applied in a poisoned candy case, has equal application to *belated and ineffectual attempts to recontrol the criminally unloosed force which causes the harm.* (See *People v. Jones,* 112 Cal.App. 68, 75, 296 P. 317; *People v. Stewart,* 97 Cal. 238, 32 P. 8.)" (Emphasis supplied)

See also: *LaFave & Scott,* Criminal Law, p. 240, § 34 (1st Ed. 1972); *Hackney v. Commonwealth, supra.*

■ Since so far as the briefs of the parties and independent research have disclosed, this precise situation has not heretofore been ruled in Missouri, the principles above discussed are adopted as controlling here. As applied to the case at bar, the defendant's alleged abandonment of his confessed intention to destroy the fraterni-

ty house by arson does not fall within the doctrine of *locus poenitentiae* and his "belated and ineffectual attempts to recontrol the criminally unloosed force" which resulted in the fire did not afford him a defense to the charge of arson nor permit him to request nor require the trial court to instruct upon the charge of attempted arson. *State v. McDaris, supra,* at 128[2] (Mo.1967). The defendant's final point is ruled against him.

For the reasons herein stated, the judgment is affirmed.

All concur.